RUTH CARPENTER, Appellee, v. CHANNING E. WOLFE et al., Appellants.

No. 43868.

Clark D. Mantz and Chas. S. White, for appellee.

M. M. Cooney and F. H. Cooney, for appellants.

STIGER, J.—The accident out of which this case arises occurred about a mile east of Coon Rapids, Iowa, on highway No. 46 at a Y intersection. Highway 46 runs east and west and the Y intersection is formed by a road running north from highway 46. The approach on highway 46 to the intersection from the west is a slight ascending grade and on the day of the accident was a smooth, straight graveled road. East of the intersection there is a slight descending grade. The distance from the west edge of the west wing of the Y intersection to center of the intersection is 100 feet.

On Sunday, June 3, 1934, the plaintiff and her husband,

George Carpenter, went to the home of Mr. Carpenter's father and mother in Mr. Carpenter's one-seated, 1930 model A Ford car to spend Sunday with them. Mr. Carpenter drove the car and was driving at the time of the accident. Mrs. Carpenter did not know how to drive a car. They were familiar with the intersection. On the trip home they drove east from Coon Rapids on highway 46. At this time the defendant Thomas Wolfe, 16 years of age, was driving a Master Chevrolet sedan, owned by his father, defendant Channing E. Wolfe, east on 46 ahead of the Carpenter car, both cars approaching the intersection from the west. Miss Dorothy Vanderloo, 18 years of age, was riding with Thomas who testified that he intended to go to the center of the intersection, make a U-turn and return to Coon Rapids. As the cars approached the intersection, the Wolfe car was on the right and south side of highway 46. At the west end of the intersection, Mr. Carpenter increased his speed and drove on the north side of the highway in an attempt to pass the Wolfe car and proceed east on 46.

Both cars reached the middle of the intersection at about the same time. At this point, Thomas Wolfe turned his car to the left, a collision followed and plaintiff's car went in a northeasterly direction across the intersection into a ditch, then up a steep bank in the northeast corner of the intersection, and then rolled down into the ditch. Plaintiff sustained personal injuries and the Carpenter car was damaged. The occupants of the Wolfe car were not injured and the damage to the car was negligible.

At the time of the accident there were no other cars in or approaching the intersection.

Thomas Wolfe, hereafter referred to as the defendant, testified that it was his intention to make a turn at the intersection; that before he got to the corner he signaled by putting his left arm straight out on the left side of the car; that before he signaled he saw the Carpenter car approaching from the rear at a distance of about 400 feet; that he held his arm out until he was almost to the middle of the intersection; that he started to turn about a foot beyond the middle of the intersection, traveling at about five miles per hour, and when the front wheels of his car were past the center of the road his car was struck by the Carpenter car. He testified that the windows of his car were open and he did not hear any horn sounded and when he

came into the intersection he was traveling about ten miles per hour.

Mr. Carpenter testified that he remained back of the Wolfe car about 25 feet for several hundred feet before he reached the intersection; that when the cars reached the intersection and he observed that the Wolfe car did not turn north on the west wing of the intersection and that no cars were approaching the intersection, he sounded his horn and turned out to the north side of the road in order to pass; that defendant did not put out his arm or give any signal that he intended to turn at the intersection until he started to make the turn to the left, at which time he put out his left arm; that both cars were traveling about 35 miles per hour when approaching the intersection; that when he saw the Wolfe car turning to the left, he sounded his horn and turned his car sharply in a northeasterly direction toward the ditch.

The jury returned a verdict for the plaintiff in the sum of $975. The answers of the jury to special interrogatories disclose that it allowed plaintiff for personal injuries $850 and for damages to her husband's car, whose claim had been assigned to her, $125.

The trial court overruled defendants' motion for a new trial and defendants appeal.

I. The first error relied on by appellant for reversal is that the verdict allowing damages for injuries to the Carpenter car was contrary to the evidence and to certain instructions of the court. The material part of instruction No. 14 is as follows:

"Statutory provisions of the state of Iowa with respect to the driving and operation of motor vehicles upon the highway of the state are as follows: Code Section 5031: 'The person operating a motor vehicle * * * shall have the same under control and shall reduce the speed to a reasonable and proper rate * * * when approaching and traversing a crossing or intersections of public highways.' A failure to observe the requirements of any of the foregoing sections of our Code would constitute negligence."

The issue on this assignment is whether, under the circumstances, the question of negligence on the part of George Carpenter was for the jury. The defendant urges that Carpenter was guilty of violating Code Section 5031 as a matter of law.

George Carpenter testified that about halfway up the hill approaching the intersection he overtook the defendant's car and followed it at a distance of about 25 feet for several hundred feet and until he could see that the road was clear to the east; that as he came up to the intersection, he was on the north side of the road ready to pass defendant's car, which was on the south side of the road, if the defendant did not signal an intention to turn north on the west wing; that the reason he did not attempt to pass defendant's car sooner was that he could not see over the intersection and observe cars approaching from the east until he was close to the intersection; that defendant was driving 30 to 35 miles per hour when he started to pass him in the intersection. Carpenter further testified: "As soon as we came to the intersection, and I thought it was safe, I made up my mind to pass the other car and speeded up my car; when the defendant's car was just past where the west track turned off to the north, I speeded up my car all I could; I still had about 80 feet to go before I reached the middle of the intersection; I would think I got my car up to between 40 and 50 miles an hour by the time I got up to the car; I was only 20 or 25 feet behind him when I speeded up my car; when the defendant's car was east of the center of the intersection, the driver stuck his arm out of the window; I had already attempted to pass him by speeding up my car; he turned his car at the same time he stuck out his hand; he did not have his hand out at any time until after he has passed the middle of the intersection; the front wheels of his car were 3 or 4 feet past the middle when I saw his arm stuck out of the window from the left side of the car; the car was already turning and I honked and started for the ditch to the northeast as sharp as I could turn; when the two cars collided, the blow turned my car around more; I lost control of my car; I had put on the brakes before the actual collision but couldn't stop; the brakes were still locked when we pulled the car out of the ditch."

Section 5031 required Carpenter to have his car under control and reduce the speed to a reasonable and proper rate when approaching and traversing the intersection.

Carpenter admits that he increased his speed while traversing the intersection from 30 to 35 miles an hour to 40 to 50 miles an hour and was increasing the speed of his car as much as possible at the time of the collision. The plaintiff's testimony as to

the manner in which the car was driven across the intersection, was substantially the same as Mr. Carpenter's testimony.

The legislature, in enacting section 5031, subsection 3, recognized that an intersection was a dangerous zone and the purpose of the statute was to provide a speed standard for intersections which requires the operator of motor vehicles to approach an intersection at a reasonable and proper rate of speed. A reasonable and proper rate of speed will depend on the existing conditions. With reference to this statute, we said in the case of Carlson v. Meusberger, 200 Iowa 65, l. c. 76, 204 N. W. 432, 437:

"The requirement that the speed of the car shall be reduced to a reasonable and proper rate must receive a reasonable construction. If the car is not traveling at a rate that is, under the circumstances, unreasonable or improper, it obviously is not required that the speed be reduced: the requirement of the statute is a rate of speed that is reasonable and proper under the circumstances."

An increase of speed in approaching and traversing an intersection is not, per se, a violation of the statute.

There was a wide, smooth area in the Y intersection immediately north of highway 46 providing ample space for the Carpenter car to pass the Wolfe car. Carpenter had ascertained that there were no other cars in or approaching the intersection before he started to pass.

Under the provisions of Code section 5032, it was the duty of defendant, before changing his course, to first see that there was sufficient space to make such movement in safety and give a proper signal indicating his intention to turn. It was proper for the jury to consider the evidence of the plaintiff that the defendant failed to comply with the provisions of this statute and to retard the speed of his car before turning, in determining whether or not Carpenter traversed the intersection at a reasonable rate of speed.

■■■ We conclude that under all the facts and circumstances there might fairly be different opinions in regard to the conduct of Carpenter and whether he traversed the intersection at a reasonable and proper rate of speed and the trial court was right in submitting the question of contributory negligence of Carpenter to the jury.

II. Another assignment of error is that the verdict is contrary to the evidence because the evidence shows conclusively that the plaintiff was guilty of contributory negligence as a matter of law. On this issue the evidence must be viewed in the light most favorable to appellee. That ordinarily the question of contributory negligence is for the jury, needs no citation of authorities.

The plaintiff stated that when defendant's car reached a position just east of the west wing of the north road, her husband sounded his horn and started to pass and when about even with the defendant's car and just past the middle of the intersection the defendant turned his car to the left and into her husband's car; that just before the cars collided, her husband again sounded his horn; that she was watching the car in front all the time until the time of the collision; that she was watching it because her husband began to pull out and had said he would pass it; that she did not see any person stick a hand out in the car ahead at any time; that she probably did not see the arm put out of the car *as her husband said he saw it* (when defendant's car was turning to the left beyond center of intersection) because she wasn't looking for those things *then.*

Plaintiff was not required to look for a warning signal at that time.

Plaintiff further testified that she did not know what speed the cars were traveling in the intersection; that her husband speeded up to pass the defendant's car; that when he speeded up, his car was toward the center of the road and then went to the north side of the road, the defendant's car remaining on the south side of the road; that it was when they got up to the defendant's car that it turned toward them; that defendant's car traveled about the same rate of speed all the way; "when it turned toward us I screamed and don't remember after that."

Plaintiff further testified: "I didn't say anything to my husband as we approached this intersection. I didn't say to him 'Is it safe to pass at this place?' I wasn't driving and I wasn't going to order the driver around. It is true in one way that we all know it isn't safe to pass at an intersection. I didn't say to my husband that he must look out or that it might be unsafe to pass another car there. I didn't wish to instruct him and I had confidence in the way he drives and I didn't consider it

my place to call his attention to any place of danger. I knew that any highway intersection is a place of danger where accidents to automobiles may occur and I knew we were coming to an intersection and I didn't say to my husband that he should look out for that place because I wasn't nervous and I didn't care about it.''

Plaintiff was observing the defendant's car from the time she approached the intersection to the time of the collision. She stated that the defendant's car was traveling at the same rate of speed from the time she first saw it until the collision. There was no slowing down of defendant's car and no signals given to indicate to her that the defendant intended to turn around in the intersection. According to Carpenter's testimony, no signal was given until the defendant's car started to make the turn. There is nothing in the record to indicate that, if defendant had given a timely signal of his intention to turn, plaintiff would not have seen it as she was watching defendant's car constantly. She had a right to rely on the skill and judgment of the driver within reasonable limits. Bradley v. Interurban R. Co., 191 Iowa 1351, 183 N. W. 493. There was no apparent imminent danger of which to warn her husband until defendant turned without giving a timely signal.

The failure of the defendant to give proper warning signal of his intention to make the turn is a circumstance that could be considered by the jury in determining the question of plaintiff's contributory negligence. Johnson v. Omaha & C. B. St. R. Co., 194 Iowa 1230, 190 N. W. 977.

 Appellant insists that the failure of the appellee to warn her husband and protest against his manner of driving constituted negligence per se. Such is not the rule in this state. In the recent case of Stingley v. Crawford, 219 Iowa 509, 511, 258 N. W. 316, 318, Mr. Justice Albert, speaking for the court, stated:

''It is next insisted that it is the duty of the passenger in exercising ordinary care for his own safety 'to keep a lookout and to warn the driver of approaching dangers, or protest against excessive speed, * * * and dangerous practices indulged in by the driver.' While this is the rule in the state of Wisconsin, it has never been adopted in this state. The furthest we have ever gone, or cared to go, is to hold that a passenger in an automobile must exercise ordinary care and caution for his own safety, and

whether he does so or not is generally a question of fact for the jury. We do not wish to commit ourselves to the doctrine that it is the bounden duty of the passenger, under any circumstances, to warn the driver of approaching danger.''

Plaintiff's duty was to exercise reasonable care for her own safety under the circumstances and it is only in the plainest case where reasonable minds could come to no other conclusion, that contributory negligence will be found as a matter of law.

We held in the case of Schwind v. Gibson, 220 Iowa 377, l. c. 386, 260 N. W. 853, that it is a settled rule of law in this state that whether or not a passenger or invited guest in an automobile, over which he has no control, is guilty of contributory negligence is peculiarly a question for the jury.

The plaintiff neither exercised control nor had the right to exercise control over the operation of the automobile and under this record we conclude the trial court properly submitted the question of appellee's contributory negligence to the jury. See Bradley v. Interurban R. Co., 191 Iowa 1351, 183 N. W. 493.

Appellant relies on Brown v. McAdoo, 195 Iowa 286, 188 N. W. 7; Hutchinson v. Sioux City Service Co., 210 Iowa 9, 16, 230 N. W. 387. The fact situations in the cited cases are so different from the facts here that they have no application to this case.

■■■ III. Appellant urges that there was evidence that plaintiff and her husband were engaged in a common enterprise and that the trial court erred in failing to submit this question to the jury and failed to instruct the jury that the negligence of the husband would be imputed to the plaintiff.

In support of this assignment of error, the appellant, in his argument, states:

''A summary of this testimony might reasonably be that this husband and wife went to have Sunday dinner with the husband's parents as a customary and usual part of their family life, at the invitation of the parents of the husband; that the wife desired to make the trip as much as her husband and they went because they both wanted to go and that they were required to return to their own home and place of employment where they both had duties to perform; that the accident occurred while they were returning.''

It may be conceded that plaintiff and her husband were engaged in carrying out a common enterprise, but, the doctrine of imputable negligence is not applicable unless it further appears that the passenger has the right to control the operation of the means of locomotion employed to carry out the common purpose. If the passenger does have this right, the driver is the agent of the passenger.

The injuries complained of by the plaintiff grew out of the means of locomotion employed. In the case of Stingley v. Crawford, 219 Iowa 509, l. c. 512, 258 N. W. 316, 318, this court stated:

"The fundamental doctrine controlling this question of joint adventure or common enterprise is not controlled by the fact that the parties are going to the same place on the same mission, but by whether or not the complaining party bore such relation to his associate as that he had the right of control in some manner over the means of locomotion."

The general rule governing the imputation of negligence where there is a common enterprise, is stated in Cram v. City of Des Moines, 185 Iowa 1292, l. c. 1297, 172 N. W. 23, 25, as follows:

"If two or more persons unite in the joint prosecution of a common purpose, under such circumstances that each has authority, expressed or implied, to act for all in respect to the conduct or the means of agency employed to execute such common purpose, the negligence of any one of them in the management thereof will be imputed to all of the others."

This doctrine is based on the relation of agency existing between the parties engaged in the common enterprise.

Mr. Carpenter owned, drove and controlled the automobile. Plaintiff had no control over, nor right to control the operation of the vehicle, nor did she undertake in any manner to direct or exercise any control over the driver. The relation of principal and agent did not exist between the plaintiff and her husband. See Lawrence, Adm., v. Sioux City, 172 Iowa 320, 154 N. W. 494; Fisher v. Ellston, 174 Iowa 364, 156 N. W. 422.

The established rule in this state is that the negligence of a driver of an automobile cannot be imputed to the passenger or guest who has no right to control the car and the driver of the car. Schwind v. Gibson, 220 Iowa 377, 260 N. W. 853; Stingley

v. Crawford, 219 Iowa 509, 258 N. W. 316; Stilson v. Ellis, 208 Iowa 1157, 225 N. W. 346; Fisher v. Ellston, 174 Iowa 364, 156 N. W. 422.

Appellant relies on the case of Crawford v. McElhinney, 171 Iowa 606, 154 N. W. 310, Ann. Cas. 1917E, 221. In that case the defendant was held liable for the negligence of his wife, who was driving his car at the time of the accident, on the ground that she was, under the facts, acting as his agent and employee.

Furthermore, the jury found that Carpenter was not negligent and allowed recovery for damages to his car. If there were a common enterprise, there being no negligence on the part of Carpenter, the failure of the trial court to instruct on common enterprise would be harmless error.

■■ IV. The trial court submitted to the jury the correct measure of damages (1) when an automobile can be repaired so as to be placed in as good condition as it was immediately prior to the accident; (2) when the car is so damaged that it cannot be placed in such condition.

The defendant claims the court committed reversible error in submitting the measure of damages applicable when the car can be repaired so that it will be in as good a condition as it was before the accident, because there was no evidence to justify the submission of this measure of damages. The record material to this issue is unsatisfactory. The plaintiff's evidence is that the Carpenter automobile could not be placed in as good condition as it was just prior to the accident by repairs and that the reasonable value was from $225 to $250 and the reasonable value after the accident was from $25 to $50.

A witness for the defendant testified:

"The cost of the repairs to the Carpenter car necessary to place it in a *serviceable condition* would be between $75 and $100 and when the car was so repaired its value would be between $175 and $200."

The witness did not testify that the car could be restored by repairs to the condition it was in *immediately before the accident*. No objection was made to this testimony.

There being no evidence that the car could be restored to the condition it was in immediately before the accident it was error on the part of the court to submit a measure of damages

for which there was no foundation in the evidence, but the error was without prejudice to the defendant.

Witnesses for the plaintiff testified that immediately before the accident, the Carpenter car was worth from $200 to $250 and immediately after the accident from $25 to $50. Under this evidence, the minimum damage to the Carpenter car was $150. The jury allowed the plaintiff $125 for damages to the car.

The defendant offered evidence that the car could be restored to serviceable condition for from $75 to $100. This evidence was not objected to and was before the jury when it deliberated on its verdict.

Under this evidence the most the jury could have given the plaintiff for damages to the car was $100.

If the jury gave consideration to the defendant's evidence, such consideration would tend to reduce the verdict below the difference between value of the car before and after the accident, and such consideration would be favorable to the defendant.

As above stated, the jury did return a verdict for damages to the car in the sum of $25 less than the amount of damages proved under plaintiff's evidence.

There was no reversible error in submitting the said measure of damages.

Finding no error it follows the case must be and is affirmed. —Affirmed. (All italics ours.)

RICHARDS, C. J., and PARSONS, SAGER, ANDERSON, DONEGAN, and HAMILTON, JJ., concur.