Esther M. TONEY, Appellee,

v.

CASEY'S GENERAL STORES, INC., Appellant.

No. 88–1654.

Supreme Court of Iowa.

Sept. 19, 1990.

Ronald W. Kuntz and Patricia A. Barry of Kuntz & Garver, Des Moines, for appellant.

Donald G. Juhl, Nevada, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ, and CARTER, JJ.

LARSON, Justice.

The key issue in this case is whether there was sufficient evidence to support a verdict against Casey's General Stores, Inc., for interfering with an employment contract between one of its franchisees, Frohwein Stores, Inc., and a Frohwein employee, plaintiff Esther Toney. The court of appeals held there was not sufficient evidence and we agree.

Casey's and Frohwein entered into a franchise agreement in 1973 under which Frohwein would pay Casey's a franchise fee of three percent, based on the gross sales of its stores. Frohwein owned a total of thirteen stores, including one in Colo, Iowa. In 1976 Esther Toney was hired by Larry Frohwein, president of Frohwein Stores, Inc., to manage its Colo store. The evidence showed that Toney was a successful manager, and the Colo store did well for the first few years.

In 1979, however, Frohwein began to experience economic problems because of the rapid rise in the price of gasoline. The franchise fee it paid to Casey's, and the management fee paid to its managers, were both based on gross sales. Frohwein's expenses rose substantially as a result, and it asked Casey's for help. Larry Frohwein testified that:

> I told him [a representative of Casey's] that, you know, we are going to have to do something, and or we wasn't going to be existing very much longer. So that's when they told us about what they were doing with the company's stores, and recommended us franchisees do the same, and that's to change the [manager's] contract.

Casey's responded to the financial problems of its franchisees, in part, by reducing its franchise fee on gasoline. Casey's also advised Frohwein to eliminate the managers' commission on gasoline, on which there was a small profit margin, and increase commissions on inside sales, where the profit was greater. The idea was to encourage managers to develop more inside sales. Frohwein decided to adopt a revised management fee structure along the lines suggested by Casey's, and Frohwein asked Casey's to handle the contract negotiations with their store managers.

Casey's did not require adoption of the new contract by any of its franchisees. It had nothing to gain financially from the adoption of a uniform contract because its franchise fee was based on gross sales. Operating expenses of the franchisees were therefore not a direct concern to Casey's, although Casey's naturally had an interest in keeping its franchisees in business. At the time of trial, "twenty to thirty" Casey's franchisees still operated under their own management agreements and management fee structures.

When a revised contract was presented to Toney, she refused to sign it, even though Frohwein made it clear that she would be fired if she did not. Representatives of Casey's also asked Toney to sign the agreement, again reminding her that her job was at stake. She continued to

refuse. On March 5, 1980, the last demand for her signature was made by a Casey's representative. On the same day, Larry Frohwein had a heated telephone conversation about the contract with Toney's lawyer. Following the telephone conversation, Frohwein asked the Casey's representative to tell Toney that she was "through," even if she were willing to sign the contract. Her keys were requested, and Toney left the store. This suit followed.

Toney's suit named Frohwein's stores on a theory of a breach of her employment contract and Casey's on a theory of interference with that contract. The district court initially dismissed both suits on the ground that suits for breach of contract and interference could not be maintained on an employment-at-will. Toney did not appeal the dismissal of her contract suit against Frohwein, but she did appeal the dismissal of her interference suit against Casey's. On that appeal, we reversed, holding that a third-party may be subjected to liability for interference with an employment-at-will. *Toney v. Casey's Gen. Stores, Inc.,* 372 N.W.2d 220, 222 (Iowa 1985). *See generally Truax v. Raich,* 239 U.S. 33, 38, 36 S.Ct. 7, 9, 60 L.Ed. 131, 134 (1915) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others.").

Following the remand from the first appeal, a jury trial resulted in a judgment against Casey's for $76,460 actual and $100,000 punitive damages. The court of appeals reversed on the ground that there was no substantial evidence of an "improper" interference by Casey's. *See* Restatement (Second) of Torts § 766A (1979). This further review followed.

Toney's reasons for refusing to sign the contract were summarized by her "objections and comments" typed on the bottom of the proposed contract, which stated that she "cannot agree to the above terms and conditions because they constitute a substantial change in my present contract of employment, in the following particulars: ...." She then set out several changes, including a $37–per–month drop in her commissions and a reduction in fringe benefits, all of which she refused to accept.

■ At the outset, it is clear that Toney's status was that of an employee at will. She could have been fired, or required to work under different terms, as her employer saw fit. Toney effectively concedes that. If Frohwein could fire Toney, it is also clear that an agent such as Casey's could fire her if authorized by Frohwein to do so. Toney does not challenge that principle either.

Toney does, however, challenge Casey's claim that it was acting on Frohwein's behalf in firing her because (1) an agency relationship was not provided for in the franchise agreement; and (2) in any event, Casey's acted "improperly" by pursuing its own interests in firing her. Specifically, she claims that Casey's was motivated by a desire to force uniformity in manager contracts, thus simplifying its own accounting, and preventing crossover management from one store to another.

■ We dispose of Toney's first contention summarily. While the written franchise agreement did not provide for representation of Frohwein by Casey's, neither did it prohibit it. It provided that the parties were not to be considered as agents of each other, but this simply meant that the franchisor-franchisee relationship did not automatically amount to one of agency. It is clear from the evidence that Frohwein relied upon Casey's in hiring its managers and in implementing personnel policies. Furthermore, it is clear that Frohwein and Casey's interpreted their franchise agreement in such a way as to permit Casey's to act as its agent in specific incidents, such as this. We believe it is clear that, in firing Toney, Casey's was in fact acting as an agent for Frohwein. The issue remains, however, whether Casey's acted "improperly" for interference purposes by pursuing its own interests in the firing.

■ Because this case was tried at law, our review is quite limited. The facts as found by the jury are binding on appeal if they are supported by substantial evidence, and we examine the evidence in the light

most favorable to the verdict. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 422 (Iowa 1977). When reviewing a trial court's ruling on a motion for directed verdict, we review the evidence in the same light as the district court in order to determine whether or not a jury question was generated. When considering a motion for a directed verdict, the court must view the evidence in the light most favorable to the party against whom the motion is made. Iowa R.App.P. 14(f)(2). Even if facts are not in dispute, if reasonable minds might draw different inferences from them, a jury question is engendered. Iowa R.App.P. 14(f)(17).

The Restatement provides this with respect to interference with an existing contract:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (1979). *See also Nesler v. Fisher & Co., Inc.*, 452 N.W.2d 191, 194 (Iowa 1990).

The key words in this section are "intentionally" and "improperly." In this case there is no question that a Casey's representative acted intentionally when he informed Toney that her employment was terminated. The issue remains, however, whether Casey's acted improperly. Casey's says it did not, that it was only acting as an agent for Frohwein, who had the power to fire Toney. Toney says that, even if Casey's were authorized to fire her, it was motivated by a desire to force adoption of a uniform managers contract. She argues that, when the evidence is viewed in a light most favorable to the verdict, there is substantial evidence to support her theory that Casey's therefore acted improperly under the Restatement rule above.

The drafters of the Restatement, in adopting the word "improper" as a part of the test for interference under section 766A, attempted to combine the concepts of culpability and lack of justification. Its introductory note states:

Instead of using the two terms in this Chapter, where the forms of the tort of interference with contractual relations are designated and are therefore more specific, it has seemed desirable to make use of a single word that will indicate for this tort the balancing process expressed by the two terms "culpable and not justified." This single expression should be as neutral as possible, not having been traditionally identified with a different tort so as to possess a special meaning that would affect its meaning in connection with this tort, and not from its connotations suggesting that an issue involved in it must be a matter for the case of either the plaintiff or the defendant. The first of these attributes eliminates such terms as unreasonable (identified with negligence), unfair (identified with unfair competition and having a long, checkered history), undue (undue influence), unjust (unjust enrichment) and inequitable. The second attribute eliminates "unjustified," the term most frequently used by the courts, because it implies too strongly that the factors involved are all manners of defense; also, because they imply too strongly that the factors are all matters of the plaintiff's case, such terms as reprehensible, blameworthy, unlawful or illegal, or even wrongful. The term "tortious" is of course, circuitous and begs the question.

The word adopted for use in this Chapter, neutral enough to acquire a specialized meaning of its own for the purposes of the Chapter, is "improper." The several forms of the intentional tort of interference with a contractual relation are set out in §§ 766, 766A and 766B. Each of them provides that the interference must be improper. Section 767 specifies and analyzes the factors to be taken into consideration in determining whether the interference is improper, and must therefore be read and applied to each of the earlier sections.

Restatement (Second) of Torts, introductory note, at 6–7.

The Restatement provides several tests to determine whether an alleged interference is improper:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement (Second) of Contracts § 767.

A comment to this section states:

Intent alone ... may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper.

.... [I]f, there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

Restatement (Second) of Contracts § 767 comment *d*.

The test suggested by section 767 involves a balancing process. In another comment it is stated:

[I]t has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'" The determination is whether the actor's interference is "improper" or not.

Restatement (Second) of Torts § 767 comment *j*.

One authority, while noting that employment and other contracts terminable at will may be the subject of actions for interference, states that

a contract at will is usually not protected when the defendant's interference with it is based on any legitimate business purpose and no improper means is used, as where one employer hires away employees of another whose contract rights are terminable at will. The principle would logically apply to any agreement that could not be enforced as a contract, since such an agreement can be avoided at will, as where a contract lacks mutuality. In all such cases the plaintiff's interest may be protected, but as a prospective advantage rather than as a contract, with the correspondingly greater freedom of action on the defendant's part.

*Prosser and Keeton on the Law of Torts* § 129, at 996 (5th ed. 1984).

▮ Applying these principles to the present case, we believe that there must be substantial evidence of a predominant motive on the part of Casey's to terminate the employment of Toney for improper reasons. Obviously, if Frohwein had the authority to fire Toney at will, so did Casey's if Casey's were acting solely on behalf of Frohwein. Toney suggests, however, that Casey's stood to benefit from the termination of the contract and that substantial evidence supports a finding that such motive was improper. The only improper motivation which could be attributed to Casey's under the evidence would be that it was attempting to standardize all of its

managers' contracts in order to expedite its bookkeeping procedures.

When Casey's, representing Frohwein, threatened to fire Toney as the ultimate lever in their contract negotiations, we believe the conduct of Casey's was permissible as "fair and reasonable under the circumstances," Restatement (Second) of Torts § 767 comment *j*, and the type of "legitimate business purpose," *Prosser & Keeton* § 129, at 996, which excuses such conduct even if an attempt by Casey's at standardizing would be considered to be improper, if standing alone.

There is no claim that Casey's attempted to force adoption of a uniform managers contract in order to prevent loss of its own managers of company-owned stores by crossing over to franchise stores with more lucrative managers contracts. In fact, there is no evidence that any crossover of managers would affect Casey's in any way. The record is silent as to whether Casey's even had any company-owned stores in the Colo trade area.

In summary, we agree with the court of appeals that substantial evidence does not support a finding of improper interference on the part of Casey's. Accordingly, we affirm the court of appeals and reverse the judgment of the district court, remanding for dismissal of the action.

DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT OF DISTRICT COURT REVERSED.