Scott HEICK and Vicki Kelley–
Heick, Appellants,

v.

Christina BACON, Appellee,

and

Stewart Richardson, Kathy Van Blaricome, other unknown/unnamed group activity participants, Herky's Tap, Inc., Corner Tap, Betty Weineke d/b/a Wink's Tap, and Burt's Tavern, Inc., Defendants.

No. 95–2215.

Supreme Court of Iowa.

March 26, 1997.

Wythe Willey of Wythe Willey Law Office, Cedar Rapids, for appellants.

Robert R. Rush and Jana L. Happel of Lynch, Dallas, Smith & Harman, P.C., Cedar Rapids, for appellee.

■■■

LAVORATO, Justice.

This case arises out of a near-head-on collision between an automobile, in which one of the plaintiffs was traveling, and a truck. The plaintiffs sued the driver of the truck, two passengers who were in the truck at the time of the collision, and four taverns. By the time of trial, all the defendants had settled except one of the passengers in the truck. A jury had been picked but before the parties presented evidence, they persuaded the district court to hear the defendant-passenger's motion for directed verdict based on some stipulated facts, interrogatories, depositions and exhibits.

The plaintiffs alleged the defendant was liable under theories of joint enterprise, joint concerted tortious activity, and aiding and abetting in the violation of a criminal statute. The district court sustained the motion for directed verdict, finding there was insufficient evidence to submit any of these theories of liability to the jury. The plaintiffs appealed, contending there was sufficient evidence to submit all three theories. We affirm.

I. *Scope of Review.*

■ We review rulings granting motions for directed verdict for correction of errors at law. Iowa R.App. P. 4. When reviewing the ruling, we view the evidence in the same light as the district court to determine whether the evidence generated a jury question. *Toney v. Casey's Gen. Stores, Inc.,* 460 N.W.2d 849, 852 (Iowa 1990). In ruling on such motions, the district court must first decide whether the party against whom the motion was made has presented substantial evidence on each element of the claim. *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986). Evidence is substantial if a jury could reasonably infer a fact from the evidence. *Johnson v. Interstate Power Co.,* 481 N.W.2d 310, 317–18 (Iowa 1992). If the

evidence is not substantial, a directed verdict is appropriate. *Id.* at 318.

Under this substantial evidence standard, if reasonable minds could disagree on an issue in light of the evidence presented, the district court must submit the issue to the jury. *Id.* Sometimes facts are not in dispute. Even so, if reasonable minds might draw different inferences from such facts, a jury question is engendered. Iowa R.App. P. 14(f)(17).

■ In addition, when ruling on a motion for directed verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is made. Iowa R.App. P. 14(f)(2). Finally, a party moving for directed verdict is considered to have admitted the truth of all evidence offered by the other party and every favorable inference that may fairly and reasonably be deduced from it. *Brown v. Ellison,* 304 N.W.2d 197, 202 (Iowa 1981).

II. *The Facts.*

Viewing the evidence in the light most favorable to the plaintiffs, we think the evidence establishes the following facts. On Saturday, February 12, 1994, at about 4:05 p.m., Stewart Richardson lost control of his pickup while traveling west on Highway 22 near Lone Tree. The pickup crossed the center line and collided, almost head-on, with a west-bound vehicle driven by Scott Heick. Randy Dudgeon was a passenger in Scott's vehicle.

At the time of the collision, there were two passengers in the pickup: Christina Bacon (now Kristy Richardson) and Kathy Van Blaricome, Kristy's friend. At times before the collision Stewart held Kristy out as his wife. The two, however, were not officially married until December 3, 1994.

Following the collision, Stewart was charged with OWI and arrested at the scene. *See generally* Iowa Code ch. 321J (1993) (defining operating while intoxicated offense). His blood-alcohol concentration was .129, beyond the legal limit for operating a motor vehicle. *See* Iowa Code § 321J.2(1)(b) (setting legal limit at .10). The parties stipu-

lated that Stewart was negligent in the operation of his pickup.

At the time of the collision, Stewart was a manual laborer and a part-time body builder. Kristy was a student at a community college. She was also a body builder. In 1982, Kristy graduated from the Iowa Law Enforcement Academy and was a police officer in Muscatine for six years.

On the afternoon of the collision, Stewart, Kristy, and Kathy were participating in an event organized by a local motorcycle club, "The Circle of Pride." Several of the club's members were friends of Stewart and lifted weights with him and Kristy. The event was called the "Not–So–Special Olympics Game Run." Each participant—there were from ten to twenty—paid a $6 fee to participate in the event. Each was issued a score card with which to keep track of their score in six events, and the winner was to receive a prize.

The participants traveled from bar to bar, in a several county radius around the city of Muscatine, drinking alcoholic beverages at each bar and playing the prearranged games. The game run was scheduled to meet at a total of six different bars. At the end of the game run, the participant with the highest total score would receive the prize. The game run began at about 11:30 a.m. and was to end at 6 p.m.

Stewart, Kristy, and Kathy had been participating between four and five hours at the time of the collision and were traveling in a caravan of other participants to the fifth of the six scheduled bars.

Several weeks before the game run, Kathy told Stewart and Kristy about the planned event. Thereafter, Kristy and Kathy planned and prepared for the event. On the morning of the event, Stewart told Kristy he did not want to go. Kristy persisted and told Stewart she would go with Kathy anyway. Finally, Stewart relented and decided to go. One reason Stewart decided to go was that he did not want Kristy socializing with the other male members of the motorcycle club unless he was present.

Although Stewart agreed to go, he told Kristy he did not want Kathy riding with them in his pickup. Kristy insisted that Kathy ride along with them and, without another word from Stewart, she did.

The trio arrived at the first bar at 11:30 a.m., paid their entry fees, and received their sign-up sheet upon which they were to keep track of their scores. The sign-up sheet specified the six bars to which the participants were to go. It was snowing at the time, making driving conditions hazardous. All of the participants agreed to travel in a caravan from bar to bar. Some of the fifteen or more vehicles involved, including Stewart's, had four-wheel drive.

As planned, Stewart, Kristy, and Kathy went from bar to bar drinking and playing the prearranged games. Between bars, Stewart left the designated route to go back to Kristy's home where he had been staying so that she could change into warmer clothes. They then rejoined the game run.

By the time they reached the fourth bar, most of the participants were intoxicated, including Stewart, Kristy, and Kathy. The participants continued to drink and play games.

After leaving the fourth bar, all of the participants headed to the fifth bar on the scheduled itinerary. On the way, the road appeared to be clear. This prompted Stewart to pull off to the side of the road where Kristy got out and disengaged the pickup's four-wheel drive.

Later, while traveling to the fifth bar, Stewart noticed the road was covered with about six to eight inches of snow. Stewart thought about stopping and re-engaging his four-wheel drive, but there was no place to pull over and the next town was only one mile away. The occupants in the car ahead of Stewart's were waving him to go on. Apparently, at this point, Kristy and Kathy told Stewart to "keep going." Stewart did so and shortly thereafter he hit an icy spot in the road, lost control, and collided with the Heick's vehicle.

### III. *Background Proceedings.*

On March 8, 1994, Scott Heick sued Stewart, Kristy, Kathy, and the four bars that had served them alcohol on the game run. Scott's wife, Vicki Kelley–Heick also sued

seeking damages for loss of spousal consortium. By the time of trial, all defendants except Kristy had settled. The Heicks claimed that Kristy was liable to them under three legal theories: (1) joint enterprise, (2) joint concerted tortious activity, and (3) aiding and abetting Stewart in the violation of a criminal statute.

The parties proceeded to trial and picked a jury. Before the parties presented any evidence, they agreed to submit the case to the court on Kristy's motion for directed verdict. The parties agreed that the court could consider some stipulated facts, answers to interrogatories, depositions, and certain exhibits. The court sustained the motion, concluding that there was insufficient evidence to submit any of the three theories to the jury.

The Heicks appealed, contending there was sufficient evidence to submit all three theories.

### IV. *Joint Enterprise.*

A. *The law generally.* According to one treatise, "[t]he doctrine of vicarious responsibility in connection with joint enterprises rests upon an analogy to the law of partnership." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 72, at 516 (5th ed.1984) [hereinafter Prosser]. A partnership is based upon a permanent business arrangement that in turn creates a mutual agency between partners to carry on some general business. *Id.* Because of this mutual agency, each partner is responsible for the acts of the other. *Id.*

A joint enterprise resembles a partnership, but it differs from a partnership in that the joint enterprise is for a more limited time and purpose. *Id.* at 516–17. Those entering into a joint enterprise do so under circumstances in which all have an equal voice in directing the conduct of the enterprise. *Id.* at 517. Under the law each is an agent for the others, and the act of any one within the scope of the enterprise is charged vicariously to the rest. *Id.* Courts have generally accepted the principle of vicarious liability in a joint enterprise but have not agreed upon any one factor by which the relation is to be determined. *Id.*

If "the enterprise is for some commercial or business purpose, and particularly where the parties have agreed to share profits and losses, it usually is called a joint venture." *Id.* In those circumstances, the law of partnership governs for tort-liability purposes. *Id.* Courts have tended to use the terms "joint enterprise" and "joint venture" interchangeably. *Id.* at 517 n. 4.

The nonbusiness application of joint enterprise has generally been confined to automobile law. Prosser § 72, at 517. There courts have applied joint enterprise to impute the negligence of the driver to the passenger. *Id.* Rarely have courts applied joint enterprise to saddle a passenger with liability to a third person injured because of the driver's negligence. *Id.*

Although there is no exact definition for joint enterprise, the following definition is widely quoted:

> [A] joint [enterprise] arises out of, and must have its origin in, a contract, express or implied, in which the parties thereto agree to enter into an undertaking in the performance of which they have a common purpose and in the objects or purposes of which they have a community of interest, and, further, a contract in which each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in the performance. Thus, we note (1) a contract, (2) a common purpose, (3) a community of interest, [and] (4) equal right to a voice, accompanied by an equal right of control.

*Carboneau v. Peterson,* 1 Wash.2d 347, 374, 95 P.2d 1043, 1054 (1939) (en banc).

A minority of jurisdictions still cling to the earlier view that "the mere association of the driver and the passenger in the use of the vehicle for any purpose in which they have a common interest of any kind" constitutes a joint enterprise. Prosser § 72, at 518. Courts and writers have condemned this view "as effectively restoring in passenger cases the discredited doctrine of imputed contributory negligence, since it is seldom that some element of common purpose cannot be found when two persons are traveling

together in a private vehicle." *Id.* (footnote omitted).

A majority of courts now require a showing of "a mutual 'right of control' over the operation of the vehicle—or in other words, an equal right in the passenger to be heard as to the manner in which it is driven." *Id.* at 519. Whether the passenger does or does not give directions is not the important factor. *Id.* The important factor is "the understanding between the parties that [the passenger] has the right to have his wishes respected[ ] to the same extent as the driver." *Id.* Without evidence of such an understanding,

> companions on a pleasure trip, members of the same family, parties engaged in a commercial transaction, [employees] riding with the employer, or [co-employees] in the course of their employment, although they may have a common purpose in the ride, are not engaged in a joint enterprise. Nor, of course, is the fact that the passenger has requested the driver to make the trip for his benefit sufficient to establish such a right of control.

*Id.* at 519–20 (footnotes omitted).

Some courts have gone a step further and have required that "the mutual right of control does not exist, and a joint enterprise does not exist, in the absence of . . . a common pecuniary interest in the use of the car for the trip." Prosser § 72, at 520. Under this rule, no joint enterprise exists where the parties are casually together for pleasure or for independent ends. *Id.* at 519. The justification for this position is that a trip which has a financial purpose involves a closer analogy to the law of partnerships. *Id.* at 520. A trip for such a purpose therefore "affords more reason for regarding the risk as properly to be charged against all those engaged in it" on an agency theory. *Id.*

The use of joint enterprise to impose vicarious responsibility on passengers has been criticized both on logical and fairness grounds:

> The contractual agreement by which [the passenger] is said to enter into such an arrangement is all too obviously a fiction in situations where the parties have merely gotten together for the ride; and upon this

there is erected a second fiction, that the passenger shares a "right of control" of the operation of the vehicle; and on this is erected in turn a third fiction, that the driver is his agent or servant. This top heavy structure tends to fall of its own weight. In the usual case the passenger has no physical ability to control the operation of the car, and no opportunity to interfere with it; and any attempt on his part to do so in fact would be a dangerously distracting piece of backseat driving which might very well amount to negligence in itself.

*Id.* at 522.

B. *Iowa's position on joint enterprise.* Iowa has followed the majority rule as to control. *Carpenter v. Wolfe,* 223 Iowa 417, 426, 273 N.W. 169, 174 (1937) (holding that joint enterprise is not applicable unless it appears that the driver and passenger were engaged in carrying on a common enterprise *and* "it further appears that the passenger has the right to control the operation of the means of locomotion employed to carry out the common purpose").

In recent years, this court—like other courts—has gone further and restricted the application of joint enterprise even more. *See Stam v. Cannon,* 176 N.W.2d 794, 798 (Iowa 1970). In *Stam,* we detailed relationships that did not afford such control: (1) marital relationships by themselves though the spouses are proceeding to the same destination; (2) a passenger contributing to the common enterprise by buying gasoline; (3) a passenger showing the driver the way to the driver's destination; and (4) joint possession. *Id.* at 797–98; *see also Everhard v. Thompson,* 202 N.W.2d 58, 61 (Iowa 1972) (holding that co-ownership between driver and passenger-spouse is not a sufficient basis to impute negligence of driver-spouse to passenger-spouse).

We then held in *Stam* that in determining whether a relationship gives the right of control there must be a common pecuniary interest by the passenger and the driver in the objective of the journey. *Stam,* 176 N.W.2d at 798. Without the common pecuniary interest element, the mutual right of

control does not exist and consequently a joint enterprise does not exist. *Id.* at 798. We noted that the Restatement (Second) of Torts section 491, comment c (1965), also included a common pecuniary interest among the elements of a joint enterprise. *Id.*

In *Stam*, a husband and wife were traveling to their respective jobs. The wife was driving the vehicle which was in her name. We held that any negligence of the wife was not imputed to her husband-passenger who was injured when their vehicle collided with the defendant's vehicle. *Id.* We rejected the application of joint enterprise to these facts because in traveling to their respective jobs the husband and wife did not share a *common* pecuniary objective. *Id.* To be sure, each *had* a pecuniary objective: going to their jobs to earn money. *Id.* But because they were not going to the same job, they did not have a *common* pecuniary objective. *Id.* There was therefore no mutual agency between driver and passenger sufficient to impute the wife's negligence to her husband.

C. *The merits.* The Heicks contend the following evidence generated a fact question on the right-to-control element of joint enterprise:

But for Kristy's involvement in this whole situation, Stewart did not want to go, but when Kristy said she was going to go with Kathy, whether he went or not, Stewart agreed to go. Even though Stewart was not going to permit Kathy to ride in their vehicle he relented when Kristy persisted. While traveling between Herky's Tap and The Corner Tap and at Kristy's request, Stewart returned to the residence they shared so that Kristy could change her clothes. After leaving the fourth bar, Stewart stopped the pickup and Kristy disengaged the four-wheel drive. Just before the collision, Stewart suggested that the three discontinue the "game run," but was told to keep going by Kristy.

At most this evidence suggests that Stewart acquiesced in (1) going on the trip, (2) allowing Kathy to tag along, (3) Kristy's request to leave the game run temporarily for her convenience, (4) Kristy's disengaging the four-wheel drive, and (5) Kristy's request to continue the "game run." We fail to see, however, how this evidence supports any kind of understanding between Stewart and Kristy that Kristy had the right to have her wishes respected to the same extent as Stewart in the *operation* of his pickup. As the owner of the pickup, Stewart had the last word and was the only one, as between Kristy and him, who could have prevented the accident. It was his decision to drive, and it was his decision how to drive.

More important, this evidence generates no fact question that Stewart and Kristy had a common pecuniary interest in the use of the pickup for the game run. They had no common monetary purpose to use the pickup that would give Kristy the right to share control with Stewart in the operation of the pickup. Rather the evidence shows that the two were engaged in a pleasure trip. Their main purpose was to drink, play games, and generally have fun. *See Price v. Halstead*, 177 W.Va. 592, 596, 355 S.E.2d 380, 385 (1987) (holding that there was no joint enterprise where driver and passengers had only the common purpose of drinking and joy riding). There was therefore no mutual agency between Stewart and Kristy that would permit imputing Stewart's negligence or unlawful acts to Kristy.

The evidence was insufficient to establish the joint enterprise theory of liability.

V. *Joint Concerted Tortious Activity (Aiding and Abetting a Tort).*

Joint concerted tortious activity is another name for aiding and abetting a tort. *Id.* at 596, 355 S.E.2d at 386. For the law on this theory, the Heicks rely here as they did in the district court on Restatement (Second) of Torts section 876(b) (1979). Section 876(b) provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

. . . .

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . .

Comment d to section 876(b) provides:

Advice or encouragement to act operates as a moral support to a tortfeasor and if

the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a *substantial factor in causing the resulting tort,* the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended trespass and when it is merely a negligent act. The rule applies whether or not the other knows his act is tortious. It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act.

The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered.

(Emphasis added.) The language "substantial factor in causing the resulting tort" requires that the encouragement or assistance given to the alleged aider and abettor must be a proximate cause of the tort causing injury.

A. *Aiding and abetting drunk driving.* Depending on the factual scenario, cases have gone both ways on whether to impose section 876(b) liability on passengers for injuries to a third party because of the driver's intoxication. In *Stock v. Fife,* 13 Mass.App. Ct. 75, 430 N.E.2d 845 (1982), after a night of drinking, the driver and his three passengers were on their way home when an accident occurred. Just before the accident, two of the passengers were drinking beer. The court found as a matter of law that the passengers had not affirmatively encouraged the driver to drink. *Stock,* 13 Mass.App.Ct. at 82 n. 10, 430 N.E.2d at 849–50 n. 10. Significantly for the court, there was no showing that "the passengers forced, pressured, or induced [the driver] to drink, or that his drinking was anything but an act of independent volition." *Id.* at 82, 430 N.E.2d at 849.

In *Olson v. Ische,* 343 N.W.2d 284 (Minn. 1984), both the driver and the passenger were intoxicated and each had taken a cup of beer with them as they left a card party to go home. On the way home, there was an accident resulting in injuries to the plaintiff who then sued the passenger. The court held as a matter of law there was no causal connection between the passenger's actions and the accident because the passenger provided no substantial encouragement of the driver's conduct. *Olson,* 343 N.W.2d at 289. The court emphasized that the driver and passenger had each drunk voluntarily and the passenger was merely a guest in the vehicle. *Id.*

In *Aebischer v. Reidt,* 74 Or.App. 692, 704 P.2d 531 (1985), evidence that the passengers kept refilling a marijuana pipe for the driver was sufficient to generate a fact question on the issue of substantial assistance. *Aebischer,* 74 Or.App. at 696, 704 P.2d at 533. There was other evidence that marijuana can impair driving ability and that the driver was affected by the marijuana. *Id.*

*Price* involved facts similar to those in *Aebischer.* The complaint alleged that the defendant-passengers were drinking and smoking marijuana and encouraged the driver to do so when he was already visibly intoxicated. *Price,* 177 W.Va. at 597, 355 S.E.2d at 387. These allegations were sufficient to allege section 876(b) liability based on substantial assistance. *Id.* at 597, 355 S.E.2d at 388.

These four cases stand for the proposition that passengers can be liable to an injured third party under section 876(b) when they actively encourage an intoxicated driver to continue his or her drug or alcohol use where such encouragement causes the accident and injury. In *Olson* and *Stock* the evidence fell short of showing such encouragement, whereas in *Aebischer* and *Price* the evidence and allegations were sufficient.

The Heicks alleged that Kristy aided and abetted Stewart's drunk driving. To overcome Kristy's motion for directed verdict, the Heicks had to produce substantial evidence that Kristy substantially assisted or encouraged Stewart to drive while drunk by active-

ly encouraging him to (1) drink or (2) continue drinking after he was already intoxicated.

■ On its facts, this case is more akin to *Stock* and *Olson* than to *Aebischer* and *Price.* There was no evidence that Kristy furnished Stewart any alcoholic drinks or encouraged him to consume them. Although Stewart and Kristy attended the events together, each partied with others, and each drank voluntarily. There was no evidence that Kristy forced, pressured, or induced Stewart to drink. His drinking was an independent volitional act.

At most, the evidence shows that Kristy knowingly accompanied Stewart while he was driving drunk. Her mere presence, however, is not substantial evidence that she assisted or encouraged this unlawful activity. The fact that she made no effort to prevent his unlawful conduct is not—standing alone—aiding and abetting.

That Kristy apparently said "keep going" just before the collision is some evidence of encouragement but not enough, we think, to rise to the level of substantial assistance or encouragement.

The evidence was insufficient to establish that Kristy aided and abetted Stewart's tortious drunk driving.

B. *Aiding and abetting the violation of the rules of the road.* Courts have also imposed section 876(b) liability on passengers who encouraged drivers to violate the rules of the road. In *Cooper v. Bondoni,* 841 P.2d 608 (Okla.App.1992), the petition alleged that four passengers in a vehicle "simultaneously urged" the driver to pass a vehicle on a hill in a no-passing zone. The petition further alleged that by these actions the passengers aided and abetted the negligent act of the driver. The negligent act was a failure to yield the right-of-way to an oncoming motorist causing a head-on collision with the plaintiff's motorcycle and resulting injuries to the plaintiff. Relying on section 876(b), the court found the allegations were sufficient to generate a jury question on whether the defendant-passengers aided and abetted the violation of a traffic offense. *Cooper,* 841 P.2d at 612.

However, another court refused to impose section 876(b) liability on a similarly situated passenger. *See Winslow v. Brown,* 125 Wis.2d 327, 371 N.W.2d 417 (App.1985). In *Winslow,* a bicyclist sued passengers of an automobile which struck and injured the bicyclist on a trail reserved exclusively for bicycles. The bicyclist's resistance to the passengers' summary judgment motion did not allege that the passengers encouraged, advised, or assisted the driver to operate on the bicycle trail. Such failure was fatal to the plaintiff's aiding and abetting theory, and the trial court's summary judgment ruling to that effect was upheld on appeal. *Id.* at 331–32, 371 N.W.2d at 423. The court emphasized that "[m]ere presence, with no effort to prevent unlawful conduct, is not aiding and abetting unless an intent to assist is communicated." *Id.* at 331, 371 N.W.2d at 423. In addition, the court noted that "passively accompanying a driver on an unlawful trip does not raise an inference of a willingness to assist." *Id.*

The Heicks also alleged that Kristy aided and abetted Stewart's violation of several rules of the road. Allegations as to the rules-of-the-road violations included failure to maintain a look-out, failure to maintain control, and failure to drive at a proper speed. To overcome Kristy's motion for directed verdict as to this theory, the Heicks had to produce substantial evidence that Kristy substantially assisted or encouraged Stewart to violate these rules of the road.

■ We think the evidence was likewise insufficient to establish that Kristy substantially assisted or encouraged Stewart in failing to (1) keep a proper-lookout, (2) have his pickup under control, and (3) obey the speed laws. Again, Kristy's mere presence is not substantial evidence that she encouraged or assisted Stewart in committing these violations.

VI. *Aiding and Abetting the Violation of a Criminal Statute.*

■ Iowa Code section 611.21 provides:

The right of civil remedy is not merged in a public offense and is not restricted for other violation of law, but may in all cases

be enforced independently of and in addition to the punishment of the former.

This statute allows a cause of action for violation of a criminal statute. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 423–24 (Iowa 1977).

Iowa Code section 703.1 is the criminal counterpart to civil aiding and abetting. Section 703.1 provides that "[a]ll persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals."

The Heicks predicate their theory of aiding and abetting the violation of a criminal statute on Iowa Code section 703.1 (aiding and abetting), Iowa Code section 707.6A(3) (unintentionally causing a serious injury by driving while intoxicated), and the rules of the road previously mentioned. In short, the Heicks contend there was substantial evidence that Kristy aided and abetted Stewart in the violation of section 707.6A(3) and the previously mentioned rules of the road. *See State v. Satern*, 516 N.W.2d 839, 845 (Iowa 1994) (applying law of accomplice liability under § 707.6A(3), injury by vehicle).

In interpreting section 703.1, we have said:

One cannot be convicted of a crime upon a theory of aiding and abetting unless there is substantial evidence to show he assented to or lent countenance and approval to the criminal act either by active participation in it or by some manner encouraging it prior to or at the time of its commission. Guilt may be established by circumstantial evidence. Knowledge is essential, but neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting. . . .

. . . .

The underlying precept of aiding and abetting is a requirement that the accessory in some way "associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed."

*State v. Lott*, 255 N.W.2d 105, 107, 108 (Iowa 1977) (citations omitted).

This definition of criminal aiding and abetting is not substantially different from the definition of civil aiding and abetting. What we said about the Heicks' civil aiding and abetting theory applies equally here. We therefore conclude that the Heicks failed to produce substantial evidence that Kristy aided and abetted Stewart in the violation of the criminal statute and the rules of the road.

The Heicks' reliance on *State v. Storms*, 233 Iowa 655, 10 N.W.2d 53 (1943) and *State v. Myers*, 207 Iowa 555, 223 N.W. 166 (1929) is misplaced. In those cases the owner of the vehicle *initiated* and encouraged the act of driving by the drunk and went along with him when the accident happened. In contrast, here Stewart—the drunk driver—owned the vehicle. There was no evidence that Kristy initiated and encouraged Stewart to drive. Her mere acquiescence and presence—standing alone—are not enough to constitute aiding and abetting.

### VII. *Disposition.*

Because there was insufficient evidence to submit to the jury the Heicks' theories of joint venture, aiding and abetting a tort, and aiding and abetting a crime, we conclude the district court correctly sustained the motion for directed verdict. We therefore affirm.

**AFFIRMED.**

All justices concur except HARRIS and LARSON, JJ., who dissent.

HARRIS, Justice (dissenting).

Under these unique facts it should have been for a fact finder to decide whether defendant Bacon aided and abetted Richardson in the operation of the vehicle at the time in question. *See* Restatement (Second) of Torts § 876(b) cmt. d (1977). I would reverse.

LARSON, J., joins this dissent.