# IN THE SUPREME COURT OF IOWA

No. 20–0484

Submitted September 15, 2021—Filed April 1, 2022

**JESSE VROEGH,**

Plaintiff-Appellee/Cross-Appellant,

vs.

**IOWA DEPARTMENT OF CORRECTIONS, IOWA DEPARTMENT OF ADMINISTRATIVE SERVICES,** and **PATTI WACHTENDORF,** Individually and in her Official Capacities,

Defendants-Appellants,

and

**WELLMARK INC.** d/b/a **WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,**

Defendant/Cross-Appellee.

Appeal from the Iowa District Court for Polk County, David May (summary judgment) and Scott D. Rosenberg (jury trial), Judges.

An employer appeals the denial of its motion for new trial and motion for judgment notwithstanding the verdict following a jury trial on an employee's sex discrimination and gender identity discrimination claims. The employee cross-appeals the dismissal of his claims against a third-party administrator on summary judgment. **AFFIRMED IN PART AND REVERSED IN PART.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, McDonald, and Oxley, JJ., joined. Appel, J., filed an opinion concurring in part and dissenting in part.

Thomas J. Miller, Attorney General, and William A. Hill (argued), Assistant Attorney General, for appellants.

Rita Bettis Austen (argued) and Shefali Aurora of ACLU of Iowa Foundation, Des Moines, John A. Knight (argued) of ACLU Foundation, Chicago, Illinois, and Melissa C. Hasso of Sherinian & Hasso Law Firm, Des Moines, for appellee/cross-appellant.

Debra Hulett (until withdrawal) (argued), Angel A. West, and Leslie Behaunek of Nyemaster Goode, P.C., Des Moines, for cross-appellee.

**McDERMOTT, Justice.**

The Iowa Civil Rights Act prohibits discrimination in employment based on ten characteristics, among them "sex" and "gender identity." Iowa Code § 216.6(1)(*a*) (2017). The jury returned a verdict in favor of Jesse Vroegh, a transgender state employee, against two state agencies and an agency official (collectively referred to as "the State" in this opinion) on Vroegh's claims of both sex discrimination and gender identity discrimination. The State argues on appeal that while Vroegh's claims of gender identity discrimination might have been properly submitted to the jury, the district court should not have submitted the separate claim of sex discrimination. The State also argues that the district court erred in its evidentiary rulings and jury instructions. Vroegh, for his part, cross-appeals a summary judgment ruling that dismissed Wellmark Inc., the third-party administrator of the State's employer-provided healthcare benefits plan, from claims that it too discriminated against him in its work on behalf of the State. Wellmark moved to dismiss Vroegh's cross-appeal as moot based on Vroegh's judgment against the State.

I.

The Iowa Department of Corrections employed Jesse Vroegh as a registered nurse at the Iowa Correctional Institute for Women from 2009 to 2016. Vroegh was born with female sexual organs and presented himself as female when he was hired. He was diagnosed with gender dysphoria (previously referred to as gender identity disorder) a few years after he began work with the Department of Corrections. Vroegh began hormone therapy and started living

publicly as a man in 2014. He also began changing virtually every government-issued indicia of his identity—birth certificate, driver's license, Social Security card, nursing license, and permit to carry firearms—to reflect his male gender and his name change from "Jessie Sue Vroegh" to "Jesse Samuel Vroegh." Vroegh notified his supervisor at the Department of Corrections, Kerri Friedhof, that he was transitioning from female to male in October 2014. By mid-2015, Vroegh was consistently using men's restrooms in public places.

In June 2015, Vroegh requested permission from Friedhof to use the male restrooms and locker rooms at work. Friedhof told Vroegh that she would discuss the issue with her supervisors and report back. In November 2015, Vroegh requested a meeting with Friedhof, the prison warden Patti Wachtendorf, the prison medical director Dr. Harbans Deol, and the employee union representative Todd Givens. At the meeting, Vroegh again asked permission to use the male restrooms and locker rooms.

Wachtendorf and Deol believed Vroegh's use of the men's facilities at the prison would be controversial. They told Vroegh not to use the men's restroom. Vroegh then suggested that they convert two single-stall gender-specific restrooms in a separate administrative building to gender-neutral restrooms and permit him to use those unisex restrooms. Vroegh believed this solution a temporary one until the prison could implement a policy permitting him to use the male restrooms and locker rooms. Wachtendorf, for her part, believed that the unisex restrooms in the separate administrative building were always intended to be a permanent solution, and one that Vroegh himself wanted. In

April 2016, Vroegh learned that he would need to use the unisex restrooms on a permanent basis, and thus he wouldn't be permitted to use the men's restrooms or locker rooms in the prison where he worked.

In December 2016, the Department of Corrections terminated Vroegh based on an allegation that he sent confidential information about an inmate to a third party. An arbitrator upheld the termination. Vroegh's lawsuit included no claim that his termination violated the Iowa Civil Rights Act.

Throughout Vroegh's employment with the Department of Corrections, the State of Iowa provided Vroegh health insurance benefits under the "State of Iowa Blue Access Plan." Wellmark administered the plan. The services agreement between Wellmark and the State specifies that Wellmark is an independent contractor. The plan is self-funded by the State, meaning that the State, and not Wellmark, pays for any claims for covered benefits deemed medically necessary. The State determines what benefits are included under the plan.

In 2015, Vroegh sought to have a double mastectomy to align his physical body with his male gender identity. Vroegh's doctor testified that this procedure (sometimes called "top surgery," "gender reassignment surgery," or "gender affirming surgery") is considered medically necessary, rather than cosmetic, within the medical field to relieve the distress that results from gender dysphoria. The plan in 2015 excluded coverage for "[s]exual disorders and gender identity disorders" under the plan's mental health coverages, and also excluded coverage for "gender reassignment surgery" under the plan's surgery coverages. Under the plan, the same mastectomy would be a covered benefit if it were sought for a

medically-necessary reason other than treatment of gender dysphoria. Wellmark denied Vroegh's request for coverage based on the exclusions in the plan. Vroegh appealed Wellmark's denial, with the denial decision ultimately upheld. That coverage denial decision isn't an issue in this appeal.

Vroegh filed this lawsuit in the district court in August 2017. He pleaded claims against the Department of Corrections and Wachtendorf for both sex discrimination and gender identity discrimination for denying him use of the men's restrooms and locker rooms. He also pleaded claims against the Department of Corrections and the Iowa Department of Administrative Services for sex discrimination and gender identity discrimination for denying the same level of healthcare benefit coverage that they provide to nontransgender employees. And finally, Vroegh pleaded claims against Wellmark for sex discrimination and gender identity discrimination for its role in providing and administering the State's benefit plan.

Vroegh moved for partial summary judgment against all the defendants, arguing that each discriminated against him in employment as a matter of law. Wellmark filed its own motion for summary judgment seeking dismissal of Vroegh's claims against it, arguing that no claim for employment discrimination could exist against it as third-party administrator of the plan. The district court denied Vroegh's motion and granted Wellmark's motion.

The case against the State proceeded to a jury trial. During jury deliberations, the jury sent a question to the court asking: "How are we defining sex vs. how are we defining gender identity? i.e. is sex = biological sex or sex on

legal documents or should it [be] considered the same as gender identity in the instructions?" The court responded: "Sex is a term used to assign or identify an individual's gender. Gender identity is but one component of the concept of sex. Gender identity is an individual's sense of their own gender which may or may not comport with the sex or gender assigned to them at birth."

The jury found in Vroegh's favor on his sex discrimination and gender identity discrimination claims against the Department of Corrections and Wachtendorf for denying him use of the men's restrooms and locker rooms. For these claims, the jury awarded $100,000 in past emotional distress damages. The jury also found in Vroegh's favor on his sex discrimination and gender identity discrimination claims against the Department of Administrative Services for denying him health insurance coverage. For these claims, the jury awarded $20,000 in past emotional distress damages. The district court awarded Vroegh attorney fees, which are granted to prevailing plaintiffs under the Iowa Civil Rights Act, totaling $348,227.24. Iowa Code § 216.15(9)(a)(8).

The State appeals both verdicts. Vroegh cross-appeals the district court's summary judgment dismissal of Wellmark. Wellmark on appeal has moved to dismiss Vroegh's appeal as moot based on his recovery against the State.

## II.

The State first argues that the district court erred in failing to submit two different jury instructions that the State requested, one pertaining to the "business judgment" rule and the other to the "same-decision" affirmative defense. A district court must give a requested instruction if the instruction

correctly states the law, applies to the case, and is not stated elsewhere in the instructions. *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 823 (Iowa 2000) (en banc). We review a district court's refusal to give a requested instruction to correct legal error. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

## A.

The State argues that it was entitled to a business judgment instruction to inform the jury that it may *not* find that the State discriminated against Vroegh "just because you might disagree with [the State's] decision or believe it to be harsh or unreasonable." The State argues this instruction would have properly focused the jury on whether the State's motivation was discriminatory and not on whether the State exercised a legitimate business judgment.

District courts must submit business judgment instructions in discrimination cases when parties have satisfied certain requirements for their use. *See Woodbury Cnty. v. Iowa C.R. Comm'n*, 335 N.W.2d 161, 165–66 (Iowa 1983) (en banc). Employment discrimination laws grant us no power "to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, *except* to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (emphasis added). To warrant the instruction, the employer's reason for the action must first be "reasonably articulated and *non-discriminatory.*" *Woodbury Cnty.*, 335 N.W.2d at 166 (emphasis added) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979), *abrogated on other*

*grounds by Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126 n.19 (1985)). In determining whether a business judgment instruction is warranted, we attempt to determine "whether the employer was moved by discriminatory bias rather than business judgment." *Cerro Gordo Cnty. Care Facility v. Iowa C.R. Comm'n,* 401 N.W.2d 192, 197 (Iowa 1987).

The district court held that the State failed to articulate any nondiscriminatory reason to support its decision, and thus refused to give the business judgment instruction. The State claims it had two nondiscriminatory reasons to deny Vroegh restroom access: (1) that Wachtendorf was concerned about other staff members' response to a transgender man using the men's restroom, and (2) that Wachtendorf had reached an agreement with Vroegh to use the unisex restrooms in the adjacent building.

As to the first reason, discriminatory action doesn't somehow shed its unlawfulness simply because it's done to placate the real or perceived biases of others. *See Schroer v. Billington,* 577 F. Supp. 2d 293, 302 (D.D.C. 2008) ("Deference to the real or presumed biases of others is discrimination, no less than if an employer acts on behalf of his own prejudices."). If that were reason enough, surely much discrimination that our laws now outlaw could continue unabated under the guise of appeasing the discriminatory sensibilities of others. The State's claim that it acted to protect the concerns of others, without more, is not enough to establish the action was "not a pretext for discrimination." *Woodbury Cnty.,* 335 N.W.2d at 166 (quoting *Loeb,* 600 F.2d at 1012 n.6).

As to the second reason, a factual dispute arose at trial about the time period that Vroegh agreed to use the unisex restrooms in the separate building. Vroegh argued that he agreed to use the unisex restrooms only temporarily; the State argued that Vroegh agreed to use them indefinitely. But this factual dispute is immaterial to our resolution of the larger legal issue here. Regardless of the duration, Vroegh didn't waive his rights under the Iowa Civil Rights Act by agreeing to use the unisex restrooms.

In *Cedar Rapids Community School District v. Parr*, two teachers brought claims of pregnancy discrimination based on the school district's maternity leave policy. 227 N.W.2d 486, 489 (Iowa 1975). The school district claimed that, because the regulation was approved by the teachers union and the two teachers themselves signed employment contracts knowing the regulation existed, the teachers waived any discrimination claims. *Id.* at 497. We disagreed, finding that the rights protected under the Iowa Civil Rights Act "are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert." *Id.* at 497–98 (quoting *Robinson v. Lorillard Corp.*, 444 F.2d 791, 799 (4th Cir. 1971)). Contractual releases of discrimination claims are generally permissible if the waiver is made knowingly and voluntarily. *See, e.g.*, *Warnebold v. Union Pac. R.R.*, 963 F.2d 222, 223 (8th Cir. 1992). But the State didn't request a waiver instruction in this case. If an employer's action is discriminatory, the employer isn't absolved simply because the employee may have acquiesced to it.

Both of the State's proffered justifications suffer from a similar defect. A claim that an employment decision was intended to pacify other coworkers, or

was made with the acquiescence of the employee, doesn't answer whether the State's motivation was nondiscriminatory. The State's explanation doesn't supply a legitimate, nondiscriminatory reason for its decision. Finding the necessary condition for the business judgment instruction lacking, we hold that the district court committed no error in refusing to instruct on it.

B.

The State also argues that the district court failed to instruct the jury on what we've referred to as the "same-decision" defense. In Iowa, we have adopted the motivating-factor standard for proving employment discrimination. *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 271 (Iowa 2019). Under this standard, for the jury to find that the employer unlawfully discriminated in employment, plaintiffs need only prove that the protected characteristic was a motivating factor in its decision. *Id.* But the same-decision defense permits the employer to avoid liability if it proves by a preponderance of the evidence that it would have made the same decision *even if* it had not taken the protected characteristic into account. *Id.* In other words, notwithstanding evidence that the employer impermissibly took the employee's protected characteristic into account in its decision, the employer may avoid liability if the employer can show it had a second, separate reason unrelated to the employee's protected characteristic that provides a lawful basis for the decision.

The district court determined that the State failed to plead the same-decision defense as required and thus waived any right to a jury instruction as to this defense and also incorporated its reasons for denying the business

judgment instruction. Vroegh argues on appeal that the district court correctly refused to instruct the jury on the same-decision defense both because the State failed to plead it and because the evidence presented at trial didn't warrant it.

Setting aside questions about whether the State properly pleaded this defense, there's a more fundamental question of the defense's application in this case. This issue overlaps with those involved in the requested business judgment instruction. As a threshold matter, the State must offer evidence of some *nondiscriminatory* basis for its decision. *See Woodbury Cnty.*, 335 N.W.2d at 166. The State isn't entitled to an instruction on a defense that it would have made the same decision if *neither* decision establishes a defense to the discrimination claim.

Again, a claim that an employment decision was intended to appease other coworkers, or was acquiesced by the employee, doesn't establish a nondiscriminatory basis for the State's decision. The State points to no evidence that there was some *other* basis for the decision to refuse Vroegh access to the men's restroom or reassignment surgery benefits. Stated differently, the State offers *no* reasons for its challenged decision other than those that related to the protected characteristic. A district court must give a requested instruction if the instruction, among other things, "has application to the case." *Weyerhaeuser Co.*, 620 N.W.2d at 823. Finding no nondiscriminatory basis for the State's decision on this record to support a viable same-decision defense instruction, we hold that the district court committed no error in refusing to instruct on it.

III.

The State next argues that the district court erred in several evidentiary rulings. We generally review claims of evidentiary errors for an abuse of the district court's discretion. *Holmes v. Pomeroy*, 959 N.W.2d 387, 389 (Iowa 2021).

A.

The State argues that the district court erred in refusing to permit the State to introduce evidence showing that the State terminated Vroegh's employment in December 2016 for sending an inmate's confidential medical records to an unauthorized third party. The State contends that Vroegh's repeated denial of sending the information, despite an arbitration award related to his termination that found to the contrary, shows a character for untruthfulness that it should have been able to offer. The State makes a related argument that the district court erred in refusing to permit it to refer to Vroegh's termination as "unrelated" to the present case, and instead requiring it state merely that his employment had "ended." The State contends that this potentially misled the jury into believing that Vroegh left his job because he could no longer tolerate the State's restroom and benefits decisions.

The district court found the circumstances of Vroegh's termination not probative of any issue in the case and further found that the potential for unfair prejudice in permitting this evidence (even if relevant) outweighed its probative value under Iowa Rule of Evidence 5.403. The district court also questioned whether "clear proof" existed to show that Vroegh committed the misconduct as

the State claimed, based on the unemployment insurance decision that conflicted with the arbitration decision regarding Vroegh's termination.

Evidence of character is generally inadmissible under Iowa Rule of Evidence 5.404, but rule 5.608 permits evidence of a witness's character for untruthfulness in the form of reputation or opinion evidence. *Id.* rs. 5.404, 5.608(*a*). The court may permit cross-examination of a witness regarding specific instances of conduct to attack the witness's character for truthfulness if the conduct is "probative of the character for truthfulness or untruthfulness" of the witness. *Id.* r. 5.608(*b*)(1).

The record shows that the incident that resulted in Vroegh's termination occurred at least a year after the events at issue in this case. No party contends that the termination incident issues are relevant to whether the State committed gender identity discrimination. Vroegh makes clear that he is not contesting his termination in this lawsuit. Considering the potential risk of confusion in delving into Vroegh's termination, the risk of unfair prejudice to him on what are indisputably matters unrelated to the issues in this case, and the seemingly minimal probative value of this evidence, we do not find that the district court abused its discretion in excluding this evidence. *See Shawhan v. Polk Cnty.*, 420 N.W.2d 808, 810 (Iowa 1988) (en banc) (finding evidence of the plaintiff's drug use, even if relevant, was highly prejudicial and therefore the trial court abused its discretion in admitting it); *Carter v. MacMillan Oil Co.*, 355 N.W.2d 52, 56 (Iowa 1984) ("The discharge of the employee who accused the defendant, even if

shown to have been based upon dishonesty, does not appear to be a proper element of impeachment under Iowa Rule of Evidence 608(b).").

The State likewise has not shown that the district court's decision allowing Vroegh to state that his "employment ended," as opposed to his "employment ended for unrelated reasons," was so unreasonable that it constituted an abuse of discretion. The State, for its part, didn't object to the district court's decision as to this language when the court ruled on the issue at the pretrial hearing, and also didn't object to this language during trial. In any event, we cannot conclude that the jury would have reached a different verdict had it been told that Vroegh's employment "ended for unrelated reasons" instead of that it "ended."

## B.

The State further argues that the district court erred in refusing to permit the State to introduce evidence of what it describes as Vroegh's "motive" in bringing the lawsuit. The State points specifically to the district court's decision to exclude statements that Vroegh made about Wachtendorf after he was terminated about wanting to put her "head on a stake" and "nailing her coffin," and about the fact he hoped to visit Florida with the money from his lawsuit. The State argues that this evidence shows that Vroegh was motivated by "vengeance" rather than "true emotional turmoil." The State even argues that Vroegh could be liable for bringing his lawsuit under an abuse-of-process theory. Vroegh, in response, argues that the district court properly excluded these statements as unfairly prejudicial and, moreover, that the alleged "motives" are immaterial to the jury's resolution of his claims on the merits.

In most situations, a party's motive is irrelevant to resolving that party's claim on the merits. In *Hohl v. Iowa Central Railway*, the defendant alleged that the plaintiff's motive in bringing suit was not to establish ownership of sand along the bank of the river but "for the purpose of levying tribute upon the defendant." 143 N.W. 850, 851 (Iowa 1913). We concluded that "[w]hatever may be the motive of appellant in prosecuting this action, his rights must be determined by the rules applicable alike to all, where there is an alleged invasion of right." *Id.*; *see also Dickerman v. N. Tr. Co.*, 176 U.S. 181, 190 (1900) ("I[f] the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits.").

Although we find the statements have no bearing on determining liability for discrimination, the State separately argues that because Vroegh sought damages for emotional distress, these statements could be relevant to show that Vroegh wasn't really emotionally distressed in the manner he testified to but rather was vindictive and angry.

But the probative value of the statements is diminished by the fact that they were made after the State had fired Vroegh for conduct that the parties hotly contested in both an unemployment insurance proceeding and an arbitration. The statements, based on when they were made, have no clear connection to the events giving rise to Vroegh's discrimination claims. Stated differently, there's no evidence linking the statements to the discrimination that Vroegh alleges; indeed, the timing suggests a much closer connection to the firing. The State had ample opportunity to cross-examine Vroegh about his emotional distress

associated with the discrimination. And as a final matter, we find no merit to the State's argument that the statements give rise to an abuse-of-process claim considering that the State, as a threshold matter, failed to plead this claim in the district court. We find no abuse of discretion in the district court's decision to exclude this evidence after weighing its probative value against the risk of unfair prejudice.

IV.

The State argues that the district court erred in permitting Vroegh's claim of wage discrimination to proceed against the Iowa Department of Administrative Services. Again, the jury found that Vroegh proved wage discrimination against the Department of Administrative Services by its failure to provide coverage for his gender reassignment surgery. Including the Department of Administrative Services as a party on this cause of action is premised, according to the State, on the Department's alleged involvement in the decision to select the State's employer-sponsored healthcare plans. The State contends that, under Iowa's collective bargaining statute, once Vroegh's union and the Department agreed on the benefits and exclusions in the plan, the Department couldn't unilaterally change any coverages (including coverage for gender reassignment surgery) since "insurance" is a mandatory subject of collective bargaining under Iowa law that the union and the Department already agreed to. *See* Iowa Code § 20.9(1). The State, in effect, argues that it confronted a no-win situation of Vroegh's union's making: either the State violates chapter 20 by unilaterally changing plan coverage to include gender reassignment surgery, or it violates the Iowa Civil

Rights Act by enforcing a plan that denies coverage and thus discriminates based on gender identity.

The State's argument fails. Chapter 20 provides that "[a] provision of a proposed collective bargaining agreement negotiated according to this chapter *which conflicts with the Code* shall not become a provision of the final collective bargaining agreement . . . ." *Id.* § 20.28 (emphasis added). The State cites no authority for the proposition that because Vroegh's *union* approved insurance coverage as part of a collective bargaining agreement, *Vroegh* should be deemed to have forfeited claims against the Department (or any other party) under the Iowa Civil Rights Act. Indeed, our caselaw provides to the contrary. *See Cedar Rapids Cmty. Sch. Dist.*, 227 N.W.2d at 497–98 (holding that plaintiffs did not waive any rights to bring claims under the Iowa Civil Rights Act notwithstanding a collective bargaining agreement because "[t]he rights assured by [the civil rights laws] are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert" (quoting *Robinson*, 444 F.2d at 799)). We thus affirm the district court's denial of the Department of Administrative Services's motion for new trial on this issue.

## V.

Finally, the State claims that the district court erred in instructing the jury on both types of discrimination claims—sex discrimination *and* gender identity discrimination—when in fact Vroegh was entitled only to the gender identity instruction. As a result of this error, the State argues, the jury was permitted to find the State liable for sex discrimination when, as a matter of law, Vroegh

possessed no such claim. The State further argues that, even if the law permitted both types of discrimination to go to the jury, Vroegh presented insufficient evidence to support the jury's verdict on the sex discrimination claim.

The Iowa Civil Rights Act prohibits discrimination in employment based on ten specific characteristics: "age, race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability." Iowa Code § 216.6(1)(*a*); *see also id.* § 216.6A (listing the same characteristics as to wage discrimination). The Iowa Civil Rights Act includes no definition of "sex." But it does define "gender identity" as the "gender-related identity of a person, regardless of the person's assigned sex at birth." *Id.* § 216.2(10). The State doesn't contest the district court's instruction to the jury on gender identity discrimination.

The question presented is straightforward: Does discrimination on the basis of "sex" include discrimination based on a person's transgender status?

We addressed this very question in *Sommers v. Iowa Civil Rights Commission* almost four decades ago. 337 N.W.2d 470 (Iowa 1983). The plaintiff was a transgender female. *Id.* at 471. Two days after starting a new job, an old acquaintance at her workplace recognized her and her new employer then questioned her about her "sexual status." *Id.* The employer ultimately told her that she couldn't use the restrooms and terminated her employment. *Id.* She pursued claims against her employer under the Iowa Civil Rights Act, but at that time, the characteristics protected under the Iowa Civil Rights Act numbered only eight: "age, race, creed, color, sex, national origin, religion, or disability." Iowa Code § 601A.6 (1981). The Act did not yet include protections for gender

identity or sexual orientation, both of which were added in 2007. *Compare id.* § 601A.6 (1981), *with id.* § 216.6 (2007). The civil rights commission and district court found that neither "sex" nor "disability" in the statute provided protections for discrimination based on transsexualism (a term largely replaced in recent decades, and replaced in this opinion, by reference to "gender identity" or "transgender" individuals). *Sommers*, 337 N.W.2d at 472–73.

In *Sommers*, this court began by distinguishing the definitions of "sex" and "gender." *Id.* at 473. Sex, we said, "connotes the anatomical qualities that determine whether one is male or female," but gender "relates to behavior, feelings, and thoughts and does not always correlate with one's physiological status." *Id.* (quoting *Doe v. State, Dep't of Pub. Welfare*, 257 N.W.2d 816, 818 (Minn. 1977) (en banc)). We determined that "sex," construed according to its common usage, "denotes male *or* female, but not both." *Id.* We thus rejected Sommers's argument that the statute's use of "sex," rather than "male or female sex," left open an interpretation that the term could refer to transgender individuals (as Sommers) with attributes of *both* sexes. *Id.* at 473–74.

We stated that the legislative purpose in adding protection on the basis of sex was "to place women on an equal footing with men in the workplace," not to forbid discrimination against transgender people. *Id.* at 474. We further recognized a legislative intent to outlaw "conduct which, had the victim been a member of the opposite sex, would not have otherwise occurred." *Id.* Our opinion underscored the legislature's omission of any express protection for transgender

people as a class, and cautioned that "it is for the legislature by statute and not for this court by judicial fiat to provide relief." *Id.*

Our holding in *Sommers* also recited as persuasive authority several federal court cases that held the word "sex" in Title VII of the Federal Civil Rights Act did not prohibit discrimination on the basis of transgender status. *Id.* Title VII, unlike the Iowa Civil Rights Act, was never later amended to add any specific protections for discrimination on the basis of "gender identity" (nor, for that matter, "sexual orientation"). We also noted some deference to the civil rights commission's interpretation of the word "sex" in the Iowa Civil Rights Act as not including protection based on transgender status. *Id.*

*Sommers* has to date been a case of first, and last, impression in Iowa; the issue of whether "sex" includes protection based on a person's gender identity hasn't been raised in any case before this court since. The district court, in denying the State's posttrial motions, reasoned that our holding in *Sommers* had been abrogated by later federal cases. Vroegh similarly urges that we deem the holding in *Sommers* as superseded by later federal cases, in particular the United States Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741–43 (2020).

The United States Supreme Court's opinion in *Bostock* generally accepted the same definition of "sex" in its interpretation of Title VII that we applied in *Sommers*. 140 S. Ct. at 1739 (stating its assumption that "sex" in the statute "refer[s] only to biological distinctions between male and female"). But the majority applied the definition in a manner that we implicitly rejected in

*Sommers*. The majority reasoned that an employer who "fires a transgender person who was identified as a male at birth but who now identifies as a female" but "retains an otherwise identical employee who was identified as female at birth" thus "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 1741–42. Such a termination decision by the employer, the majority concluded, violates the law because it "intentionally discriminates against that individual in part because of sex." *Id.* at 1744.

The dissenters in *Bostock* rejected the majority's reasoning. They contend that the majority fashioned a new and implausible interpretation of "sex" that looks not at discrimination based on "*sex itself*" but instead things merely "related to, based on, or defined with reference to, 'sex.'" *Id.* at 1761 (Alito, J., dissenting). By expanding what constitutes "sex" discrimination in this way, according to the lead dissent, the majority "loads the dice" by ignoring the possibility that the sole motivation for the employer's decision may well be the employee's transgender status (a permitted motivation under Title VII) and not the employee's sex when defined as one's biological status at birth as male or female (an unlawful one). *Id.* at 1762.

We look to the federal courts' interpretations of similar constitutional and statutory language as persuasive authority, but we aren't bound by them. Iowa's courts have interpretive authority over Iowa's statutes. "Even where language in a state civil rights statute is parallel to the Federal Civil Rights Act," we have said, "a state court is under no obligation to follow federal precedent." *Pippen v.*

*State,* 854 N.W.2d 1, 28 (Iowa 2014). And particularly with statutes in which the text in the state and federal versions differs in critical ways, as here, federal court interpretations carry even less persuasive value.

In arguing that the *Bostock* majority correctly interpreted discrimination based on "sex" as including discrimination based on gender identity, Vroegh in effect argues that "gender identity" is subsumed within the meaning "sex." We disagree with the *Bostock* majority on this issue and thus reject Vroegh's argument advancing it. Discrimination based on an individual's gender identity does not equate to discrimination based on the individual's male or female anatomical characteristics at the time of birth (the definition of "sex"). An employer could discriminate against transgender individuals without even knowing the sex of the individuals adversely affected. But that employer, lacking knowledge of the male or female anatomical characteristics of any of the effected employees, would not (and could not) be engaging in unlawful discrimination based on the individual's "sex." We see no reason to jettison the interpretive analysis in *Sommers* construing "sex" according to its common usage and to include "transgender" status or other characteristics similarly attenuated from an individual's male or female anatomical characteristics, particularly considering that the Iowa Civil Rights Act provides separate protections based on gender identity.

Vroegh argues that we should construe "sex" to include discrimination based on transgender status because the Iowa Civil Rights Act, by its own terms, instructs that it "be construed broadly to effectuate its purposes." Iowa Code

§ 216.18(1) (2017). But our duty in construing this statute, even with the instruction to construe it broadly, requires first that we provide "a fair interpretation as opposed to a strict or crabbed one—which is what courts are supposed to provide anyway." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 233 (2012) [hereinafter Scalia & Garner]. Such a provision doesn't allow courts to ignore the ordinary meaning of words in a statute and to expand or contract their meaning to favor one side in a dispute over another. We effectuate the statute's "purposes" by giving a fair interpretation to the language the legislature chose; nothing more, nothing less. "Sex" doesn't expand to "gender identity" (or anything other than "sex") simply because the statute contains an instruction that it be "construed broadly." We may not through the judicial metamorphosis of words declare a Hulk where the legislature placed merely Bruce Banner.

The legislature's amendments to the statute also support our reasoning. When the legislature amended the Iowa Civil Rights Act in 2007, it did not simply insert into the statute a definition of "sex" that included one's gender identity, as it just as readily could have done. Instead, it added "gender identity" to the list as its own separate characteristic, and provided the term with its own separate definition. We generally don't read statutes to imply that the legislature wasted its time and ink by including redundant provisions. Canons of statutory interpretation require that every word and every provision in a statute is to be given effect, if possible, and *not* deemed mere surplusage. *Bribriesco-Ledger v. Klipsch*, 957 N.W.2d 646, 650–51 (Iowa 2021). No word should be ignored, and

no provision should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence. Scalia & Garner at 174; *accord United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). We thus hold that the district court erred in submitting the sex discrimination claim to the jury.

The remedy for the district court's improper instruction presents a separate question. The jury, on the jury verdict form, answered "yes" to separate questions about whether Vroegh proved his claim of sex discrimination against each defendant, and his claim of gender identity discrimination against each defendant. But the verdict form didn't distinguish between the two causes of action in its damages questions, requesting instead a total amount to compensate Vroegh for emotional distress damages based on the State's discrimination on the basis of "sex and/or gender identity." We thus have no easy method of striking damages awarded for sex discrimination while leaving undisturbed damages for gender identity discrimination.

The jury indicated some confusion about the distinction between "sex" and "gender identity" discrimination in the jury instructions. During deliberations, the jury sent a question to the judge that stated: "How are we defining sex vs. how are we defining gender identity? i.e. is sex = biological sex or sex on legal documents or should it [be] considered the same as gender identity in the instructions?" The court answered: "Sex is a term used to assign or identify an individual's gender. Gender identity is but one component of the concept of sex. Gender identity is an individual's sense of their own gender which may or may

not comport with the sex or gender assigned to them at birth." We find the district court's response rather confusing, particularly in its circular use of the word "gender" in defining "sex" and its description of gender identity as "one component of the concept of sex."

But we also find that the court's response more or less defined sex discrimination *as* gender identity discrimination. Add to this our review of the evidence of discrimination presented at trial, which we conclude focused on discrimination associated exclusively with Vroegh's transgender status and *not* his sex. Indeed, the State argues as much in asking us to overturn the sex discrimination verdict based on insufficiency of evidence for that claim. In light of the evidence presented, the jury's question during deliberations, the court's response to the question, and the jury's verdicts, we're left with the conclusion that the jury based its award on the emotional distress that Vroegh suffered from gender identity discrimination, not sex discrimination. Instructional errors do not merit reversal unless prejudice results. *Wells v. Enter. Rent-A-Car Midwest,* 690 N.W.2d 33, 36 (Iowa 2004). We find no prejudice resulted here and find on this record that the amount of damages the jury awarded should not be disturbed.

We reverse the district court's denial of the motion for judgment notwithstanding the verdict and dismiss the jury's verdict as to the sex discrimination claims, affirm the jury's verdicts as to the gender identity discrimination claims, and affirm the jury's damages award in the amounts stated.

VI.

Vroegh argues that the district court erred in dismissing his claims against Wellmark at the summary judgment stage. But Wellmark argues on appeal, as a threshold matter, that Vroegh's claims against Wellmark are moot because Vroegh will already receive his full recovery for all his discrimination claims from the State. Said differently, because Vroegh's dismissed claims against Wellmark are the same ones for which he already won a full judgment against the State, any further pursuit of these claims against Wellmark would be ineffectual. In cases with joint tortfeasors, "where two parties are asserted to be jointly liable in tort, a satisfaction of the cause of action against one joint tort-feasor is a satisfaction against all." *Hutchinson v. Treloar*, 294 N.W. 787, 787–88 (Iowa 1940). We have "repeatedly recognized the universal rule that there can be but one satisfaction for an injury." *Pundzak, Inc. v. Cook*, 500 N.W.2d 424, 429 (Iowa 1993) (quoting *Greiner v. Hicks*, 300 N.W. 727, 731 (Iowa 1941), *abrogated on other grounds by Thomas v. Solberg*, 442 N.W.2d 73, 74 (Iowa 1989)).

The jury awarded emotional distress damages—the only damages that Vroegh sought—against the State on his claims of sex and gender identity discrimination related to his health benefits. The district court then awarded Vroegh $387,227.24 in attorney fees and costs as permitted under the Iowa Civil Rights Act but calculated this amount without fees and costs associated with Vroegh's dismissed claims against Wellmark. Wellmark argues that the past emotional distress damages that the jury awarded were "actual damages" and

that Vroegh, by not pursuing any other damages, waived his right to go after other damages against Wellmark.

Vroegh, on the other hand, argues that his claims against Wellmark are not moot because the judgment did not provide him with the full extent of the damages available under the Iowa Civil Rights Act, including his right to attorney fees associated with his claims against Wellmark. Vroegh acknowledges that he didn't seek any compensatory damages against the State, but that he would have pursued these damages against Wellmark. Specifically, Vroegh points to $2,170.76 in out-of-pocket expenses that he didn't recover through the jury's verdict. As to his attorney fees, Vroegh argues that the district court's fee award excluded $41,258.66 in attorney fees associated with his claims against Wellmark.

Even if we were to find that Vroegh relinquished his right to pursue compensatory damages against Wellmark based on his failure to seek them at trial against the State, Wellmark's mootness argument runs aground on the subject of legal fees. Under the Iowa Civil Rights Act, the relief available to a plaintiff "shall include but [is] not limited to actual damages, court costs and reasonable attorney fees." Iowa Code § 216.15(9)(*a*)(8); *see also id.* § 216.15(9)(*a*)(9). A statutory fee provision that uses the word "shall," we have said, "*requires* the district court to award attorney fees to any plaintiff awarded any judgment" in the case. *Lee v. State*, 874 N.W.2d 631, 644–45 (Iowa 2016) (awarding attorney fees under a similar provision in the Family Medical Leave Act). We've noted that this fee-shifting provision ensures "that private citizens

can afford to pursue the legal actions necessary to advance the public interest vindicated by the policies of civil rights acts." *Ayala v. Ctr. Line, Inc.*, 415 N.W.2d 603, 605 (Iowa 1987).

In analyzing Vroegh's right to pursue his legal fees against Wellmark, it doesn't matter that Vroegh at trial pursued only his emotional distress damages and failed to pursue his compensatory damages claim. If the district court erred in dismissing Wellmark at the summary judgment stage, then Vroegh would have been entitled to some additional amount of attorney fees under the statute related to its claims against Wellmark.

A moot case "no longer presents a justiciable controversy because the issues involved are academic or nonexistent." *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 442 (Iowa 1983). The test for mootness is whether a judgment "would be of force and effect with regard to the underlying controversy." *Id.* (quoting *Women Aware v. Reagen*, 331 N.W.2d 88, 92 (Iowa 1983)). Vroegh claims to have incurred over $40,000 in attorney fees associated with his claim against Wellmark. The Iowa Civil Rights Act grants him the right to recover not only damages but reasonable attorney fees too. The summary judgment ruling in Wellmark's favor, if granted in error, prevented him from that recovery. Vroegh's claim against Wellmark thus has not been mooted by his judgment against the State.

## VII.

In granting Wellmark's motion for summary judgment, the district court determined that Wellmark could not be held liable for employment

discrimination under the Iowa Civil Rights Act as a mere third-party administrator of the State's health plan. Vroegh argues on appeal that the district court erred in its analysis and that Wellmark may be held liable for discriminating against him (1) as a "person" under sections 216.6 and 216.6A, (2) as an "agent" under section 216.6A, and (3) as an "aider and abettor" of the State under section 216.11.

A.

Section 216.6 makes it an unfair employment practice for any "person" to discriminate in employment based on a protected characteristic. Iowa Code § 216.6(1)(*a*); *accord id.* § 216.15(1). The statute defines "person" as "one or more individuals, partnerships, associations, corporations, legal representatives, trustees, receivers, and the state of Iowa and all political subdivisions and agencies thereof." *Id.* § 216.2(12). The prohibition on discrimination under the Iowa Civil Rights Act thus may extend beyond an actual employer. *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 34 (Iowa 2021); *Vivian v. Madison*, 601 N.W.2d 872, 872 (Iowa 1999).

Vroegh argues that a jury could find Wellmark's denial of coverage for gender reassignment surgery constitutes discrimination under section 216.6. Vroegh points to a change in the plan's language as relevant to his claim against Wellmark. The 2014 plan excluded "[s]exual identification or gender disorders" from coverage under mental health services, but "gender reassignment surgery" was not specifically listed as excluded under surgical services. Vroegh claims that Wellmark took the initiative in recommending that the State exclude gender

reassignment surgery from coverage and drafted the plan language to make it so. Vroegh cites an email a Department of Administrative Services employee sent to Wellmark asking whether Wellmark would "still provide information to the State Medicaid staff" as evidence of Wellmark's close relationship as an advisor to the State. Another employee of the Department of Administrative Services testified that she did not understand Wellmark to be asking whether the State would like to provide coverage for gender reassignment surgery, but rather that Wellmark was informing the State the surgery was definitively not covered. An account manager at Wellmark who worked on the State's plan testified that although the State could reject any terms that Wellmark proposed, in practice, the State rarely did so.

Vroegh thus describes Wellmark not merely as an advisor but as the "driving force" behind the denial of his sex reassignment surgery coverage. Vroegh argues that Wellmark's role in administering claims provided it broader discretion than the district court acknowledged, and that the district court ignored evidence of Wellmark's "substantial control" over plan participants' health insurance coverage.

Wellmark contends the evidence shows that it only asked the State to clarify its existing policy of excluding coverage for gender reassignment treatments and that gender reassignment surgery was always excluded from coverage based on the exclusion in the mental health coverages. Wellmark notes that it presented the State with a draft showing the clarification and that the State at all times had the ultimate authority on the coverages. The State updated

its plan effective January 2017 to include coverage for gender reassignment surgery. Vroegh had top surgery in 2018, paid by insurance through his new employer.

Not every "person" with a connection to an employment decision bears legal liability for a discriminatory action. In *Sahai v. Davies*, an employer contracted with a physician and medical clinic to conduct physical examinations of job applicants. 557 N.W.2d 898, 899–900 (Iowa 1997) (en banc). A job applicant sued the physician and medical clinic after the physician recommended that the employer not hire the applicant because she was fourteen weeks pregnant. *Id.* The applicant argued that the physician and clinic were each liable for the discriminatory decision as a "person" under section 216.6. *Id.* On our review of the record, we found the physician's and medical clinic's roles "advisory" to the prospective employer. *Id.* at 901. Because their recommendations were "directly responsive" to the employer's request for an independent medical judgment, we determined that the employer decided how to use that advice in making an employment decision. *Id.* at 901–02. We held that the claims against the physician and medical clinic, as mere advisors, did not fall within the prohibition created in section 216.6. *Id.*

More recently, in *Rumsey v. Woodgrain Millwork, Inc.*, an employee sued his employer, along with the employer's human resources director and production manager, for disability discrimination. 962 N.W.2d at 19–20. The two individual defendants argued that they could not be liable under section 216.6 because they were not supervisors with decision-making authority over

employment actions involving the plaintiff. *Id.* at 20. We stated "that an individual who is personally involved in, and has the ability to effectuate, an adverse employment action may be subject to individual liability for discrimination under section 216.6." *Id.* at 36. Finding the record insufficient to decide the extent of the individuals' roles in the employer's alleged discriminatory decision, we remanded the case as to these claims. *Id.* at 36–37.

The record shows that, in 2014, Wellmark brought to the State's attention that the benefits plan excluded coverage for "sexual identification or gender disorders," but did not specifically address gender reassignment surgery. Wellmark suggested that, because the State had previously excluded coverage for this surgery, the State clearly describe this exclusion. The State elected to adopt the suggested language, and thus the 2015 version of the benefits book expressly excluded coverage for "gender reassignment surgery."

When Vroegh submitted a preauthorization request for gender reassignment surgery in 2015, Wellmark denied the request as beyond the benefits available under the State's plan. But based on the benefit plan's prior exclusion of coverage for "sexual identification or gender disorders," we believe the district court correctly held that Vroegh's requested surgery would not have been covered under the State's benefit plan even without the additional language added at Wellmark's suggestion. Wellmark, for its part, would have had no authority to revise or ignore the exclusion in the State's plan.

Our focus centers on whether Wellmark was in a position to "control" or "effectuate" the denial of benefits to Vroegh on the basis of sex or gender identity.

*Id.*; *Vivian*, 601 N.W.2d at 875–76. The record demonstrates that the ability to choose the benefits in the State's benefit plan resided with *the State*. Indeed, as to Wellmark's role and power to decide whether to include this particular benefit in the State's plan, we find illuminating the fact that, at several points (including twice in 2015), Wellmark brought to the State's attention that, if the State chose to do so, it could provide coverage for gender reassignment surgery. Wellmark even presented the State with a link showing Wellmark's own internal medical policy that included coverage for gender reassignment treatment or procedures. The State nonetheless declined to add this coverage. Similar to the medical experts that we held were not within the sphere of liability as a matter of law in *Sahai*, we find that Wellmark's role in the State's benefit plan insufficient to control or effectuate the denial of benefits to sustain an action against it under section 216.6. We affirm the district court's dismissal of Vroegh's claim against Wellmark as a "person" under sections 216.6 and 216.6A.

B.

Vroegh further argues that the district court erred in dismissing his claim against Wellmark for wage discrimination under section 216.6A as an "agent" of the State. *See* Iowa Code § 216.6A(2)(*a*). The district court held that Wellmark, both under its contract with the State and as reflected in its actions in carrying out the contract, served as the State's independent contractor and not its agent. Vroegh argues that the existence of an agency relationship requires a factual determination that the district court misappropriated from the jury in granting summary judgment.

It appears that none of our prior cases have addressed questions about the liability of an "agent" under this statute. We have broadly stated that an agency relationship exists when there is (1) "manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control"; and (2) "consent by the latter to so act." *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977); *see also Metro. Prop. & Cas. Ins. v. Auto-Owners Mut. Ins.*, 924 N.W.2d 833, 841 (Iowa 2019). Whether a party serves as another's agent is ordinarily a question of fact. *Peak v. Adams*, 799 N.W.2d 535, 546 (Iowa 2011).

Yet the same considerations for defining the liability of a "person" under section 216.6 (discussed above) apply also to defining the liability of an "agent" under section 216.6A. The question of liability is not resolved simply by determining whether a party satisfies the definition of "agent" in the abstract. Certainly the medical advisor in *Sahai* met the definition of "person" (as an "individual" under the definition), yet was still held not to be liable for the alleged employment discrimination under section 216.6. Examples of potential "agents" who fall beyond the scope of the statute's liability are easy to imagine: a vendor providing the State with computer programs to facilitate communications with employees, for instance, might be deemed an "agent" of the State, but that does not mean the contractor subjects itself to liability for discriminatory decisions by the State communicated to employees using its computer programs.

In analyzing this issue, we must consider not merely whether Wellmark was serving in some capacity as the State's agent, but more critically, whether

its role as demonstrated in the record furnished it with the ability to control or effectuate the discriminatory denial of benefits to Vroegh. The parties' arguments at their core require us to make a threshold determination of causation; we must decide, in other words, whether sufficient evidence exists for a jury to consider whether Wellmark could be said to have controlled or effectuated the decision to deny Vroegh coverage for the gender reassignment procedure.

The limitations on Wellmark's role in administering the plan were neither hidden from view nor manufactured as part of this litigation. Both the contract between Wellmark and the State, and the State's benefit plan booklet provided to plan participants, make clear that Wellmark had no power in its coverage determinations to deviate from the State's choices as reflected in the plan. The State's contract with Wellmark identified Wellmark as "an independent contractor" and expressly *not* as "employees or agents of the State of Iowa or any agency, division or department of the State." The plan benefits booklets provided to plan participants (such as Vroegh) described Wellmark's limited role at multiple points. In a notice on the opening page, plan participants were informed that "Wellmark provides administrative services and provider network access only." The benefits booklet thereafter expounds on this point, stating: "No agent, employee, or representative of [Wellmark] is authorized to vary, add to, change, modify, waive, or alter any of the provisions described in this benefit booklet."

The district court appropriately cited a persuasive Wisconsin federal court case, *Boyden v. Conlin*, in which employees brought claims against a third-party administrator of their employer's health plan for discrimination in denying

coverage for gender dysphoria. No. 17–cv–264–wmc, 2017 WL 5592688, at *1 (W.D. Wisc. Nov. 20, 2017). The court ruled that because the defendant was "only responsible for administering its health plans according to these dictated terms," the defendant was "not an agent of plaintiff's employer with respect to employment practices, but rather a provider or vendor of services." *Id.* at *3.

Other cases offer similar persuasive authority on this point. In *Klassy v. Physicians Plus Insurance,* a plaintiff brought a discrimination claim against an insurance company that refused to pay for a surgery outside the plan's regular coverage that was necessary to uphold the plaintiff's religious beliefs. 276 F. Supp. 2d 952, 953–54 (W.D. Wis. 2003). The court held that the insurance company could not be liable as an "agent" under Title VII because the insurance company was not an agent regarding employment practices. *See id.* at 960; *see also Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1113 (9th Cir. 2000) (dismissing the plaintiff's discrimination claim against an insurance company that was "simply the administrator" of the employer's plan); *Baker v. Aetna Life Ins.,* 228 F. Supp. 3d 764, 770 (N.D. Tex. 2017) (dismissing the discrimination claim of an employee with gender dysphoria against a third-party administrator arising from a coverage denial because the authority to approve or deny claims did not bring the administrator within an "agency theory of employer liability" under Title VII).

We thus find no error in the district court's holding. The district court cited Wellmark's lack of authority to "make an exception to a plan term" and the State's sole authority to decide "what benefits will be provided." Without

authority to alter coverage under the plan—and, as a result, without authority to approve requests for medical procedures excluded under the plan—Wellmark in administering the plan could not discriminate against Vroegh as an "agent" of the State under section 216.6A. We affirm the district court's dismissal of Vroegh's claim against Wellmark as an "agent" under section 216.6A.

## C.

Iowa Code section 216.11 makes it "an unfair or discriminatory practice for . . . [a]ny person to intentionally *aid, abet,* compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter." Iowa Code § 216.11(1) (emphasis added). Vroegh argues that the district court erred in dismissing his claim for discrimination against Wellmark as an "aider and abettor" of the State's discrimination.

To prove a cause of action for aiding and abetting, the plaintiff must show "a wrong to the primary party, knowledge of the wrong on the part of the aider, and substantial assistance by the aider in the achievement of the primary violation." *Ezzone v. Riccardi,* 525 N.W.2d 388, 398 (Iowa 1994); *see also Heick v. Bacon,* 561 N.W.2d 45, 51–52 (Iowa 1997) (en banc) (citing Restatement (Second) of Torts § 876(b) (Am. L. Inst. 1979)) (stating that aiding and abetting liability requires the aider and abettor's "encouragement or assistance" to be a proximate cause of the tort).

The same considerations we discussed above about whether Wellmark possessed the ability to control or effectuate the discriminatory denial of benefits to Vroegh in violation of the statute are again present in considering liability

under an aiding-and-abetting theory. In *Deeds v. City of Marion*, we affirmed the district court's dismissal of aiding-and-abetting discrimination claims against a clinic whose employee provided advice to a city about an applicant's physical fitness for a job, after which the city declined to hire the applicant. 914 N.W.2d 330, 350 (Iowa 2018). Citing *Sahai* for one of two grounds supporting the holding, we described how the clinic's "advisory role" providing an independent medical judgment for the employer in making its hiring decision was insufficient as a matter of law to sustain a discrimination claim against the clinic on an aiding-and-abetting theory. *Id.* at 351.

The district court's ruling recognized the lack of evidence demonstrating Wellmark's substantial assistance under an aiding-and-abetting theory in causing the discriminatory action. The court explained that "although it assisted the State by administering the plan—even offering suggestions for clarification of exclusory language—'Wellmark's actions did not cause Plaintiff's injury.' " (Citing *Heick*, 561 N.W.2d at 53.) Again, the State possessed the sole authority to establish coverage exclusions and to decide whether an exception to an exclusion would be made. Wellmark's role as administrator of the plan, as elaborated above, fails on this record to establish the "substantial assistance" necessary for Vroegh to prevail on his discrimination claim. We thus affirm the district court's dismissal of Vroegh's claim against Wellmark as an "aider and abettor" under section 216.11.

## VIII.

For these reasons, we reverse the district court's denial of the motion for judgment notwithstanding the verdict and dismiss the jury's verdict as to Vroegh's sex discrimination claims, affirm the jury's verdicts as to his gender identity discrimination claims, affirm the jury's damages award in favor of Vroegh in the full amounts that the jury entered, and affirm the district court's grant of summary judgment in favor of Wellmark.

**AFFIRMED IN PART AND REVERSED IN PART.**

Christensen, C.J., and Waterman, Mansfield, McDonald, and Oxley, JJ., join this opinion. Appel, J., files a concurrence in part and dissent in part.

#20–0484, *Vroegh v. Iowa Dep't of Corrs.*

**APPEL, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part.

I concur in much of the discussion of the applicability of the Iowa and Federal Civil Rights Acts to this case and I fully agree in the thoughtful discussion of the issues related to evidence and instruction. However, I do not agree with the majority's discussion of Iowa Code section 216.18(1) (2017), which declares that the act is to be "construed broadly." I also wish to supplement the majority opinion by making clear that a satisfaction occurs only when a judgment has been paid, not when liability is imposed. Further, based on my review of the record, I conclude that Wellmark Inc. was not entitled to summary judgment in this case.

**I. Scope of the Iowa Civil Rights Act.**

**A. Introduction.** On the question of interpretation of the Iowa Civil Rights Act (ICRA) to the transgender issues, Jesse Vroegh directs our attention to the majority opinion of Justice Gorsuch in the recent case of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). In *Bostock*, the United States Supreme Court considered whether the term "sex" as used in the Federal Civil Rights Act of 1964 was broad enough to protect against transgender discrimination. *Id.* at 1737. In that case, Justice Gorsuch made a forceful "plain meaning" argument for the proposition that the phrase "because of sex" in Title VII of the Federal Civil Rights Act includes discrimination against transgender individuals. *Id.* at 1738–40, 1750.

We took a different path almost forty years ago in *Sommers v. Iowa Civil Rights Commission*, 337 N.W.2d 470 (Iowa 1983). In *Sommers*, we concluded that the term "sex" in the ICRA referred only to anatomical features of a person and not broader notions of gender. *Id.* at 473–74. Although recognizing that the Federal Civil Rights Act and the ICRA are different statutes, Vroegh questions the continued validity of *Sommers* in light of *Bostock*. Vroegh essentially argues that even though the federal and state civil rights statutes do not necessarily have the same meaning, the reasoning of Justice Gorsuch's elegant opinion in *Bostock* is so powerful that we should overrule *Sommers*.

**B. Rewriting Iowa Code Section 216.18(1).** In considering the continuing validity of *Sommers*, the majority confronts the legislative direction in Iowa Code section 216.18(1), which states that the ICRA is to be "construed broadly." In *Sommers*, this court had stated that section 216.18(1) should be "construed liberally to effect its purpose." 337 N.W.2d at 473 (citing Iowa Code § 601A.18 (1981); *Franklin Mfg. Co. v. Iowa C.R. Comm'n*, 270 N.W.2d 829, 832 (Iowa 1978) (en banc)). The majority employs a work-around to defang the "construed broadly" legislative directive by citing an approach developed by Justice Antonin Scalia and Bryan Garner. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 233 (2012). Scalia and Garner do not think that the term "broadly" in such legislation actually means "broadly." Instead, Scalia and Garner, linguistic magicians, simply declare the term "broadly" now actually means "fairly." *See id.* The majority gobbles up this gobbledygook.

The Scalia and Garner approach is flawed. It eliminates the legislative direction entirely. I have never heard a party urge this court to construe a statute unfairly, and I would bet my last two-dollar bill that no Iowa lawyer has ever asked a court to do so. Relying on Scalia and Garner, the majority apparently seeks to remove the legislatively chosen term and replace it with a word more to their liking. "Broadly" means "fairly." Voila! Those with a curious bent might pull their smart phones out of their pockets, find a thesaurus, and look for synonyms for the term "broadly." But you know the answer before you even start. You will not find "fairly" listed as a synonym for "broadly" in any thesaurus.

Speaking of "fairly," I really don't think one can fairly suggest that Justice Gorsuch in *Bostock* declared a Hulk where the legislature placed merely Bruce Banner, or that the plaintiff was asking us to do so in this case. I regard the issue presented about the meaning of the term "sex" here as a much closer question than that posed by the colorful straw characterization employed by the majority.

There is history here, garnished with irony. Remember Justice Scalia joined opinions strictly construing the scope of the Americans with Disabilities Act (ADA) in a way that the public—as did Congress—found unacceptable. *See, e.g.*, *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196–97 (2002) (declaring the phrase "substantially limits one or more major life activities" must be strictly interpreted), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110–325; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488–89 (1999) (stating that whether impairment substantially limits any major life activity "is

to be determined with reference to corrective measures"), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110–325. The bipartisan response of Congress to these narrow decisions of the United States Supreme Court was to override it and to direct the courts that in future cases the terms of the ADA should be construed "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," 42 U.S.C. § 12102(4)(A), *see also Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 8 (Iowa 2014) (citing 42 U.S.C. § 12102(4)(A)).

So, the strict construction of the statute favored by Scalia led to a directive from Congress to construe the statute in favor of "broad" coverage in the future. The debacle arising from the *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams* and *Sutton v. United Air Lines, Inc.* cases is exactly what the Iowa Legislature sought to avoid when it enacted Iowa Code section 216.18(1).

The majority does not recognize that its treatment of Iowa Code section 216.18(1) is inconsistent with our past precedent. We discussed the provision in *Goodpaster*, 849 N.W.2d at 10, and *Pippen v. State*, 854 N.W.2d 1, 28 (Iowa 2014).

In *Goodpaster*, a seminal decision of this court, we cited the history of Congress overturning narrow United States Supreme Court interpretations of the ADA. 849 N.W.2d at 9–10. We noted that the direction to broadly construe the ICRA has impact on cases, noting, for instance, that a broad interpretation of the term "actual damages" was adopted in part because of a precursor to Iowa Code section 216.18(1). *Id.* at 10; *see also Chauffeurs, Loc. Union No. 238 v. Iowa*

*C.R. Comm'n*, 394 N.W.2d 375, 382–83 (Iowa 1986). In *Goodpaster*, we broadly construed provisions of the ICRA to include multiple sclerosis as a disability under the statute. 849 N.W.2d at 13. This generous construction of the ICRA, of course, was inconsistent with the crabbed approach of the discredited and overruled *Toyoto* and *Sutton* precedents. The legislative direction to construe the ICRA "broadly" was therefore well served in *Goodpaster*.

In *Pippen*, we noted that the ICRA was different from the federal statute because it includes Iowa Code section 216.18(1). 854 N.W.2d at 28. We cited a host of cases in other jurisdictions that gave substantial meaning to a similar legislative direction in state civil rights laws. *See id.* (citing *Fair Emp. Pracs. Comm'n v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 354 N.E.2d 596, 600 (Ill. App. Ct. 1976) (noting similar provision in Illinois law requires interpretations with the "widest constitutional application"); *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 571–73 (Minn. 2008) (en banc) (holding that interpretation of ambiguous terms should be broad because state law required "liberal construction of its terms"); *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 785 (Ohio 1999) (giving liberal construction provision in departing from federal precedent under Ohio law)). Turning to the Iowa jurisprudence, we stated in *Pippen* that "an Iowa court faced with competing legal interpretations of the Iowa Civil Rights Act must keep in mind the legislative direction of broadly interpreting the Act when choosing among plausible legal alternatives." *Id.*

The provision that the ICRA should be "construed broadly" does significant work. Iowa Code § 216.18(1). As noted by a leading commentator, "[T]he

Supreme Court has often chosen narrow statutory interpretations that do not comport with the liberal reading to be given to employment discrimination statutes." Sandra F. Sperino, *Diminishing Deference: Learning Lessons from Recent Congressional Rejection of the Supreme Court's Interpretation of Discrimination Statutes*, 33 Rutgers L. Rec. 40, 42 (2009). By declaring that the ICRA should be broadly interpreted, the legislature has ensured that narrow interpretations of civil rights provisions by the United States Supreme Court will have little precedential value in interpreting the ICRA. That is exactly what happened in *Goodpaster*, just as the legislature intended.

**C. Stare Decisis.** As I review *Sommers*, I find the case rather crabbed in its handling of the term "sex." As such, I would have focused instead on the legislative direction which required this court to broadly and liberally construe Iowa Code section 216.18(1). *See Sommers*, 337 N.W.2d at 473–74. In terms of legal analysis, there is simply no comparison between *Sommers* and Justice Gorsuch's forceful presentation in *Bostock*.

Further, there is the doctrine of stare decisis. As the United States Supreme Court has said, "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 864 (1992).

In this case, *Sommers*'s definition of the term "sex" has been interwoven with the subsequent legislative action. After *Sommers*, the legislature chose to overrule the holding not by providing a broader definition of the term "sex," but instead, by adding two new protected classes—sexual orientation and gender

identity—to the statute. 2007 Iowa Acts ch. 191, § 3 (codified at Iowa Code § 216.6(1)(*a*) (2007)). In effect, the legislature has ratified the narrow interpretation of "sex" in *Sommers* by adding a new category, "gender identity," to accomplish a broader coverage under the ICRA. Justice Stevens made a powerful point in *Citizens United v. Federal Election Commission* when he noted that the doctrine of stare decisis plays a special role when the legislature has acted in reliance upon it. *See* 558 U.S. 310, 408–09 (2010) (Stevens, J., concurring in part and dissenting in part). Although *Sommers* in my view is an unsatisfying conclusory precedent, I join the majority in concluding that we should leave matters where we found them in light of the subsequent legislative action relying upon it. But I join with some trepidation as this case could be interpreted by some as giving a green light to conclusory and unsatisfying precedents like *Sommers*.

## II. Satisfaction vs. Liability.

On the question of liability of Wellmark, I want to begin with the threshold question of whether a judgment against the State parties is some kind of satisfaction that absolves Wellmark from liability. The answer is no. I generally agree with the proposition in the caselaw that "a satisfaction of the cause of action against one joint tort-feasor is a satisfaction against all." *Hutchinson v. Treloar*, 294 N.W. 787, 787–88 (Iowa 1940). Yet, this principle has nothing to do with *liability* of joint tortfeasors. It is simply a rule that provides that if one joint tortfeasor totally satisfies (i.e. pays) a judgment, a plaintiff cannot obtain double recovery by seeking to collect damages from a different joint tortfeasor. *Id.*

Liability still attaches to all joint tortfeasors, a principle that is critically important if some joint tortfeasors are judgment-proof but others have deep pockets. Once a money judgment has been satisfied, there can be no double recovery. So, in this case, Vroegh as the plaintiff is entitled to a total recovery of his damages of $120,000 plus reasonable attorney fees, but once the total amount has been paid, or satisfied, Vroegh cannot collect more on his judgment.

**III. Third-Party Liability of Wellmark.**

**A. Introduction.** I now turn to the substantive question of Wellmark's liability. Vroegh tends to conflate the design of benefits with the administration of the plan. Vroegh's brief repeatedly refers to Wellmark's role in "plan design and administration" as if it were a unitary concept, but plan design and plan administration are different concepts.

There is, in my mind, little doubt that with respect to administration of the plan, Wellmark may well be liable for discriminatory acts either under a "person," "agency," or "aiding and abetting" theory *on an appropriate factual showing*. To the extent Wellmark claims that a third-party plan or benefits administrator may *never* be liable under the ICRA, it overshoots the mark. Similarly, the fact that final authority regarding the scope of the plan rested with the State does not mean that nonstate actors cannot still sufficiently participate in the decision to be liable under the ICRA. For me, the critical question does not turn on a categorical judgment that insulates the third-party administrators from liability in all cases, but a granular review of the record to determine if the plaintiff has made an adequate factual showing to survive summary judgment in this case.

**B. Legal Framework for Determining Third-Party Liability.**

1. *Liability as a "person" or "employer."* The ICRA is broader than Title VII in that nonemployer "persons" may be liable. *See* Iowa Code § 216.6(1). This principle was recognized in *Vivian v. Madison,* 601 N.W.2d 872, 874 (Iowa 1999) ("ICRA is sufficiently distinct from Title VII so as to require an independent analysis."). We have recognized that in some situations "a person guilty of discriminatory conduct is not the actual employer of the person discriminated against." *Sahai v. Davies,* 557 N.W.2d 898, 901 (Iowa 1997) (en banc).

There is authority for the proposition that liability may extend to a third party of another entity if the third party is "in a position to control" the company's employment decision. *See Johnson v. BE & K Constr. Co.,* 593 F. Supp. 2d 1044, 1049–50 (S.D. Iowa 2009) (denying motion to dismiss where third party allegedly demanded the employer terminate an African–American employee and therefore was in a position to control the company's hiring decisions); *see also Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1341 (D.C. Cir. 1973); *Christopher v. Stouder Mem'l Hosp.,* 936 F.2d 870, 875 (6th Cir. 1991).

Further, in some cases, the term "employer" is construed beyond its common meaning to include third parties with respect to a specific employment action. *E.g. Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England,* 37 F.3d 12, 17 (1st Cir. 1994) (holding association could be employer under ADA). It has been noted that a third party may be treated as an employer if there is a sharing of responsibilities such that the parties are "so intertwined" as to be acting together as an "employer." *See id.* Similarly, it has been held that the term

"employer" includes "any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *See Vanguard Just. Soc'y, Inc. v. Hughes*, 471 F. Supp. 670, 696 (D. Md. 1979). So, under the ICRA, a third party like Wellmark has potential liability as a "person" whose conduct is sufficiently entwined, or as an "employer" if the third party conduct "significantly affects access" to employment benefits.

Finally, in *Tovar v. Essentia Health*, 857 F.3d 771, 773 (8th Cir. 2017), an insured employee brought an action under Minnesota's civil rights statute and the Federal Affordable Care Act alleging denial of coverage for gender reassignment surgery for her son. The question arose whether the third-party administrator of the plan, Health Partners, Inc., should be dismissed from the case. *Id.* at 774. The *Tovar* court noted that the plan documents directed beneficiaries to send claims, complaints, and appeals of claims denial to the third-party administrator. *Id.* at 778. More importantly, the *Tovar* court noted that: "If HealthPartners Inc. . . . provided [the employer] with a discriminatory plan document, Tovar's alleged injuries could well be traceable to and redressable through damages by those defendants notwithstanding the fact that [the employer] subsequently adopted the plan and maintained control over its terms." *Id.*

2. *Liability as an agent.* Agency is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent')

that the agent shall act on the principal's behalf and *subject to the principal's control*, and the agent manifests assent or otherwise consents so to act." *Deeds v. City of Marion*, 914 N.W.2d 330, 349 (Iowa 2018) (quoting Restatement (Third) of Agency § 1.01, at 17 (Am. L. Inst. 2006)). The existence of an agency relationship is typically a factual question. *Metro Prop. & Cas. Ins. v. Auto-Owners Mut. Ins.*, 924 N.W.2d 833, 841 (Iowa 2019) ("Whether an agency relationship exists under these circumstances is a question of fact."); *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977).

The distinction between an agent and an independent contractor is an important one. It has been said that where an actor exercises independent judgment, an agency relationship is ordinarily not present. *Deeds*, 914 N.W.2d at 349. Here, the agreement between the State and Wellmark declares that the relationship between the two parties is not one of agency. Of course, declarations of the legal effect of a relationship in a contract are not determinative if the facts support a different outcome. *See C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753, 760 (Iowa 2010).

But there is no categorical rule that third-party administrators may not be agents. The United State Courts of Appeals for the First, Second, and Seventh Circuits have held that agency liability for third-party administrators for benefits discrimination under the Federal Civil Rights Act may be found where (1) the third party exercises control of an important aspect of an individual's employment, (2) where the party significantly affects an individual's access to employment opportunities, or (3) where an employer delegates to a third party

sufficient control of some traditional rights over employees to a third party. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 669 (7th Cir. 2013); *see also Carparts Distrib. Ctr., Inc.*, 37 F.3d at 17 (holding that when a third party exists solely for the purpose of enabling entities to delegate their responsibility, the third parties are so intertwined with those entities that they must be deemed an employer for purposes of the ADA). In this case, the question is whether Wellmark presented undisputed facts which show that the State did not fall within any of these categories of agency.

3. *Liability for "aiding and abetting."* The ICRA declares that it is an unfair or discriminatory practice for "[a]ny person to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter." Iowa Code § 216.11. The ICRA does not define "aid and abet." So, what does it mean under the ICRA to aid and abet a violation?

Drawing comparisons from the criminal law context, a person aids and abets "when a person actively participates or in some manner encourages the commission" of an unfair or discriminatory practice prior to or at the time of commission, liability may attach. *See State v. Maxwell*, 743 N.W.2d 185, 197 (Iowa 2008). There is authority for the proposition that a second level supervisor who "actively participates or in some manner encourages" an unlawful action may be liable under the ICRA on an aiding and abetting theory. *See Asplund v. iPCS Wireless, Inc.*, 602 F. Supp. 2d 1005, 1011 (N.D. Iowa 2008). Additionally, there is authority for the proposition that a third-party entity that intentionally

"aided, abetted, compelled or coerced" an employer to take adverse action against an employee may be liable as well. *See Johnson*, 593 F. Supp. 2d at 1052.

**C. Application of Legal Framework to Wellmark's Motion for Summary Judgment in this Case.**

1. *Introduction.* I now turn to application of the law to the facts. I begin with a general observation. Wellmark zealously argues that because the State retained the statutory and contractual power to determine the benefits under the plan in question, Wellmark is entitled to summary judgment. It is undisputed in this case that the State had that formal authority.

However, the statute and contract that formally provide the State with the authority to approve the terms of its benefit plan does not categorically foreclose a plaintiff from asserting a claim in connection with a denial of benefits under the ICRA for discrimination. A plaintiff may attempt to show, as a matter of fact, that the third party had practical control over the employment decision or that the State delegated its authority to engage in the allegedly discriminatory action, in whole or in part, to a third-party plan administrator. Even if the undisputed facts show that the State retained the ultimate decision-making authority related to the scope of benefits and made the ultimate decision with respect to the scope of benefits, a plaintiff is still entitled to attempt to show that a third party has aided and abetted the State in exercising its power in a discriminatory fashion.

2. *Application of principles.* The summary judgment record includes the testimony of Dr. Timothy Gutshall, Wellmark's chief medical officer. Gutshall testified regarding the State's Blue Access benefits booklets for 2014, 2015, and

2016. Gutshall noted that the benefits booklet for 2014 contained an exclusion for mental health services for gender dysphoria, but that the benefits booklet was "clarified" in 2015 by the inclusion of explicit language excluding surgery arising from gender dysphoria. The following deposition colloquy between counsel and Gutshall occurred and was part of the summary judgment record:

Q. What's your understanding as to why that [mental health] exclusion exists?

A. I think, as I said before, I'm not sure exactly why it exists. That's a historical benefit exclusion is my understanding prior to 2007.

Q. When you say historical benefit exclusion, are you saying that it's there because it had always been there?

A. From my perspective. I'm sure someone who put it in may actually have a different opinion on that, but that's my understanding. It's just been there.

Q. And you don't know how it originally came to be?

A. No, I don't.

So, what exactly does the above exchange establish as undisputed fact? Certainly it is undisputed that there is an express exclusion *for mental health services* for gender dysphoria in the 2014 benefits booklet. Gutshall believes the exclusion for mental health services arising from gender dysphoria had been around since 2007.

The testimony does not establish the reasoning behind the mental health exclusion. Gutshall testified that he did not have any understanding of why the exception for mental health services developed, but only that "[i]t's just been there." He offered no evidence to show that the mental health exclusion was

intended, magically, to also include surgery related to gender dysphoria. He offered no testimony at all about an unspoken policy of the State excluding benefits for surgery that somehow got lost in the bureaucratic ether and did not make its way into the benefits booklets prior to 2015. In any event, all that Gutshall could tell us is that prior to 2015, there was an express exclusion for mental health services, but no explicit exception for surgery for gender dysphoria.

There are no documents suggesting that the State had expressly decided that gender affirming surgery was not covered prior to 2015. All the prior benefits booklets in the record contain the exclusion for mental health services, but they provide coverage without exception for all necessary surgeries. These documents suggest that under the State's plan prior to 2015, mental health services for gender dysphoria were excluded but all necessary surgeries (which categorically would include necessary surgery for gender dysphoria) were covered.

There was evidence that the State's benefits booklet was the lodestar in determining coverage. Specifically, there was testimony from a State human resources professional who dealt with employee benefits issues:

> Q. And how do you go about making sure you have a thorough understanding of what is and what is not covered under the State of Iowa policies for its employees and retirees?
>
> A. We get from Wellmark every year like a redlined version of the benefit booklet which we review and approve so that Wellmark can then publish it.
>
> . . . .
>
> Q. So who initiated the redlines, do you know? Was that Wellmark, or was that somebody at the State?

A: No. That was Wellmark.

The key point here is that up until 2015, the benefits booklets developed by Wellmark had the express exclusion for mental health services for gender dysphoria, and had covered necessary surgeries without any exception for gender dysphoria.

Further, the 2012 Request for Proposal (RFP) seeking an administrator for the State's health plans did not have any provision related to the exclusion of gender affirming surgery. Yet, the RFP did require that the winning bidder, Wellmark, comply with all laws, including "all laws applicable to the prevention of discrimination in employment." Therefore, if Wellmark as administrator made decisions contrary to the ICRA, it would be out of compliance with the terms of the RFP.

Here is the real question: where did the view that surgery was not covered come from? Who made that decision and when did it occur? On this question, Gutshall provided the following explanation:

> Q. So what brought that addition [of new language in the 2015 benefits booklet expressly excluding surgery for gender dysphoria] about?

> A. I think there was a lot of confusion in regards to administering a treatment for gender dysphoria that is actually surgical. And I think, from one members' perspective, that seemed to be a little confusing.

> We have always administered the gender identity disorder or gender dysphoria exclusion. We have always administered that to not allow gender reassignment surgery. Gender reassignment surgery is a treatment for that condition.

> From our members' perspective, it's surgery. So I offered and worked with the team that actually does the documents here to be

> able to say we thought we could probably make it better from our member's perspective to actually call out gender reassignment surgery because of the fact that it is a little bit confusing to consider that it's a mental health exclusion even though it's a surgical procedure. And I thought it would just be much more clear for our members to be able to see that within the surgical benefit section.

In other words, Gutshall offered substantial evidence, when interpreted in a light most favorable to a nonmoving party, that Wellmark as third-party administrator, and not the State, "*always administered*" the "gender dysphoria exclusion" in a fashion that excluded benefits for surgery. Hence, the fair inference from his testimony is that the theory of this administrative approach was based upon Wellmark's interpretation that since the plan excluded mental health services for gender dysphoria, it must also exclude surgery arising from gender dysphoria. While the plan itself may have expressly excluded mental health services for gender dysphoria since 2007, a reasonable inference from Gutshall's testimony is that it was Wellmark's administrative decision that interpreted the mental health exclusion to extend to surgery for gender dysphoria.

Gutshall said nothing about the State's direction regarding how to interpret the mental health exclusion prior to 2015. But there was evidence that Wellmark had a practice of always administering the plan to exclude gender dysphoria surgery.

Wellmark's administrative interpretation that surgery for gender dysphoria was excluded even though the only specific exclusion was for mental health services caused, in Gutshall's words, "confusion." That is certainly not surprising. Further, there was evidence in the record that the employee who

raised the issue specifically mentioned civil rights related to fair medical treatment and that Wellmark had discriminatory concerns about the sensitive issue of covering or not covering surgery for gender dysphoria. Gutshall's response to the member "confusion" caused by Wellmark's administrative interpretation of the benefits plan was to call the Wellmark team together to draft a new provision to put into the benefits booklet that backed up Wellmark's prior administrative interpretation of the plan.

There is evidence of email traffic in November of 2015 that is relevant on the roles played by the State and Wellmark on the question of exclusion of necessary surgery for gender dysphoria. The email was from a State account manager to a State supervisor. The supervisor, on November 13, 2015, stated, "We'd agree that none of our plans cover that treatment at this time." That, of course, was after Wellmark had brought the matter to the attention of State officials and proposed changes to the 2015 benefits booklet.

Further, the account manager testified as follows regarding the exclusion of gender dysphoria surgery:

> Q. Did you agree with Mr. Beichley that none of the plans covered that treatment?
>
> A. Correct. Yes.
>
> Q. And why would you conclude that none of the plans covered that treatment?
>
> A. Wellmark had indicated it's not currently covered.

So, Wellmark arguably not only came up with the original interpretation of whether surgery was covered, but it also initiated what it calls the clarification

process. A fair inference from the record is that Wellmark, in the past, interpreted a narrow exclusion to broadly exclude coverage for surgery, that the inconsistency in the plan caused confusion, and that at least one employee was raising the issue of discrimination in connection with the exclusion. At this point, Wellmark had potential exposure for its administrative action that excluded necessary surgery for gender dysphoria but not for other necessary surgical procedures. So, when controversy arose, Wellmark sought to ratify its past administrative interpretation by drafting a clarification and presenting it to the State for its approval.

The evidence leaves room for the following theory. First, the interpretation of the plan that the mental health exclusion implied exclusion of surgery arose from Wellmark's administration. Under the plan documents, Wellmark had the authority to make benefit determinations and those determinations were subject to appeal only within Wellmark. At this point, Wellmark would be acting as the State's agent with respect to the determination of an important employee benefit.

Second, Wellmark initiated the effort in 2015 to get the State to ratify its prior interpretation through what it called a clarification. The policy embraced by the clarification, of course, has been found in this case to be unlawful and in violation of the ICRA and the Federal Civil Rights Act. Prior to 2015, persons excluded from coverage by Wellmark's administrative interpretation that surgery was not covered would thus have a claim against Wellmark for discrimination under both state and federal law. Wellmark initiated a clarification process to obtain State approval of its prior interpretation, a move that would lessen the

potential legal exposure of Wellmark. If so, a fair inference may be made that Wellmark was acting in its own best interests when it proposed the new policy.

It seems to me, under these facts, the plaintiff can at least make the case that Wellmark was so intertwined with the State to have exposure to liability under both agent and aiding and abetting theories. This is clearly not a case where Wellmark simply exercised professional judgment and had nothing to do with the discriminatory action. It is nowhere near the situations in *Sahai v. Davies* and *Deeds v. City of Marion*, where professionals simply exercised independent judgment and had nothing to do with the allegedly adverse decisions of a third party.

Instead, the inference may be drawn from the evidence, again viewed most favorably to the plaintiff, that Wellmark itself was a significant actor in the unlawful exclusion of surgery for gender dysphoria. It was arguably Wellmark's interpretation of the benefit plan that commenced the discriminatory policy. That policy did not go down well with at least one member, causing confusion in light of the lack of an exclusion for necessary surgery. And, the effect of the clarification is to obtain ratification of its prior interpretation of the plan documents and provide legal protection against future claims.

Even under the above approach, perhaps the State's ultimate ratification of Wellmark's proposed clarification cuts off Wellmark's liability as the State's agent from that point forward. Yet, the record establishes that the State always accepted Wellmark's proposed amendments to the plan, thus suggesting that Wellmark had controlled aspects of the benefits decision in this case. *See Brown*

*v. Bank of Am. N.A.*, 5 F. Supp. 3d 121, 134 (D. Me. 2014). In any event, it seems clear that Wellmark's actions arguably were a substantial cause to the adoption of the clarification that excluded coverage for the surgery in this case. As a result, a jury could find that Wellmark and the State were "so intertwined" and that Wellmark was a party who through its actions "significantly affects access" to employment benefits. *Tovar*, 857 F.3d at 778; *Carparts Distrib. Ctr., Inc.*, 37 F.3d at 17; *Vanguard Just. Soc'y, Inc.*, 471 F. Supp. at 696. Finally, it seems to me there is a triable issue on the question of whether Wellmark aided and abetted the State's discriminatory action by using its administrative authority to interpret the plan to unlawfully exclude surgery for gender dysphoria, and then, after confusion emerged, drafted a clarification for the State's approval, at least impliedly suggesting its adoption. *Asplund*, 602 F. Supp. at 1011; *see also Reilly v. Anderson*, 727 N.W.2d 102, 115 (Iowa 2006) (aiding and abetting requires evidence that the party "encouraged or assisted" another). A jury, of course, might well reject these theories, but that reality has little consequence on a motion for summary judgment.

Because there was evidence from which a jury could reasonably infer that Wellmark was a significant actor in the events that led to the discriminatory action by the State, the motion for summary judgment on the aiding and abetting theory under the ICRA should have been denied.